## UNITED STATES *v.* BETHLEHEM STEEL CORPORATION ET AL.[*]

No. 8. Argued December 9, 1941.—Decided February 16, 1942.

---

[*]Together with No. 9, *United States Shipping Board Merchant Fleet Corporation* v. *Bethlehem Shipbuilding Corporation, Ltd.*, also on writ of certiorari, 311 U. S. 632, to the Circuit Court of Appeals for the Third Circuit.

290

Solicitor General Fahy argued the cause (*Attorney General Jackson, Solicitor General Biddle, Assistant Attorney General Shea,* and *Messrs. Warner W. Gardner, Melvin H. Siegel, Frederick Bernays Wiener, Oscar H. Davis,* and *Paul D. Page, Jr.* were on the brief; and *Solicitor General Fahy, Assistant Attorney General Shea,* and *Messrs. Melvin H. Siegel, Robert L. Stern,* and *Paul D. Page, Jr.* were on the reply brief) for petitioners.

*Mr. Frederick H. Wood,* with whom *Mr. Alfred McCormack* was on the brief, for respondents.

MR. JUSTICE BLACK delivered the opinion of the Court.

These two cases arise from a dispute between Bethlehem Shipbuilding Corporation, Ltd., and the Government about the amount of profits claimed by Bethlehem under thirteen war-time contracts for building ships. The contracts were negotiated and executed in 1917 and 1918, when Germany's destructive warfare against our ocean shipping essential to the successful prosecution of the war made it necessary for the United States to build the greatest possible number of ships in the shortest possible time. They are typical products of a system of procurement heavily relied upon by the United States Shipping Board Emergency Fleet Corporation and other government purchasing agencies at the time.

On June 15, 1917, Congress gave to the President sweeping war powers, 40 Stat. 182, including (1) the power to commandeer shipbuilding plants and facilities, (2) the power to purchase ships at what he deemed a reasonable price with a provision for subsequent revision by the courts in the event the seller regarded the price set as unfair, and (3) the power to purchase or contract for the building of ships at prices to be established by negotiation. Acting under authority delegated to it by the President with Congressional approval, the Fleet Corporation declined to seek utilization of the first and second methods but chose, under the third alternative, to make purchases through ordinary business bargaining.

The "actual cost" to Bethlehem of building the ships over which this dispute arises was about $109,000,000. The generously inclusive formula[1] for determining "ac-

---

[1] Included in the detailed and comprehensive itemization of "actual cost" were the following and "items similar thereto in principle":

"The net costs . . . of labor (including compensation of labor by way of bonuses), and materials, machinery, equipment, and sup-

tual cost," not challenged by the Government here, was not peculiar to these contracts. It was based on the standard formula used by the Fleet Corporation in its contracts with other shipbuilders. And, as in practically all contracts of this type, there was no risk of loss.[2] The total profits claimed under the contracts by Bethlehem, and

plies . . . and other direct charges, such as insurance on the vessels, etc.

"A proper proportion of running expenses, including ordinary rentals, . . . repairs, and maintenance, light, heat, power, insurance, management, salaries (including compensation by way of bonuses), and other indirect charges . . .

"A proper proportion of interest accrued . . . on bonds or other debts or loans existing or contracted for prior to the date of this contract and the proceeds of which shall be used, or shall have been or shall be invested in plant, equipment, etc., that shall be used, in the performance of the work under this contract.

"A proper proportion of taxes of all kinds accrued during the taxable year with respect to the business or property, except any Federal taxes.

"A proper proportion of physical losses actually sustained within the taxable year in connection with the construction of the vessels under this contract, including losses from fire, flood, storm, riot, vandalism, any acts of God, acts of war, or other casualties and not compensated for by insurance or otherwise.

"A reasonable allowance, according to the condition, for depreciation of values of the property and plant of the Contractor used in connection with the work under this Contract."

Neither in the contracts nor under any relevant statutory provision was there any restriction on salaries and bonuses to be paid to executives of the shipbuilder or its affiliates. Cf. Sections 505 (c) and 805 (c) of the Merchant Marine Act of 1936, 49 Stat. 1985, 1999, 2013.

[2] Even in the case of lump sum contracts with the Government, it is generally recognized that the real risk of loss is negligible. It is usual in this kind of contract to set prices high enough to cover, or otherwise specifically to provide against, unforeseen contingencies. And where loss does occur contrary to the expectation of both parties, Congress often passes special bills making the contractors whole.

allowed by both courts below, were about $24,000,000 [3] or a little more than 22% of the computed cost.[4] This figure of $24,000,000 does not include such profits as may have been made by Bethlehem Steel Company, Bethlehem's parent, which sold it at the maximum prices established by the War Industries Board, 43,000 tons of steel used in these ships.[5] The percentage of profits in relation to the actual investment and working capital devoted by Bethlehem to the building of the ships was not found by either of the courts below.[6]

In No. 8, the Government filed a bill in equity against Bethlehem and others. The bill alleged that the Gov-

---

[3] These ships apparently cost the Government at least a large part of still another $4,825,415. The Government paid this amount to Bethlehem to aid in expansion of plant facilities to build the ships—facilities which were turned over to Bethlehem after the war. The Government's money was contributed under a contract commonly in use whereby the contractor was given the option of purchasing the additional facilities at a depreciated value. Whether the Government, upon conveyance of the property, received any compensation at all does not clearly appear.

[4] While profits on individual contracts ranged above and below 22%, both in the proceedings below and in this Court the whole series of contracts was regarded as a unit. The Government has made no separate argument with respect to the individual contracts in which more than the average profit was realized, nor has Bethlehem with respect to the contracts in which the amount due under the half-savings clause proved to be small. The only finding of the Master in which any separation of contracts is made shows that the profits realized on contracts in which the estimated costs were checked by the Fleet Corporation were higher than those on contracts in which the Fleet Corporation accepted Bethlehem's estimates without check.

[5] Compare the statutory method of restricting profits of affiliates embodied in § 803 of the Merchant Marine Act of 1936, 49 Stat. 1985, 2012.

[6] The contracts contained a provision, usual in Fleet Corporation contracts, under which the Government agreed "to provide the cash funds necessary to pay for work already done and materials already furnished and for carrying on the work under this contract."

ernment had been induced to enter into the contracts by fraudulent representations of Bethlehem's agents; and as an independent ground for relief, that it had been the duty of Bethlehem to perform the contracts fairly, honestly, and economically "in the shortest practicable time" for no more than "a fair and reasonable profit" and that any provisions in the contract for payment of more are "void and unenforceable." The prayer was for an accounting and a decree requiring Bethlehem to refund all amounts previously paid to it by the Government in excess of what the court should find to be just and reasonable compensation for building the ships. Bethlehem filed an answer and a counterclaim for damages based on alleged breach of contract by the Fleet Corporation.

In No. 9, Bethlehem brought suit at law against the Fleet Corporation, claiming damages for breach of the same contracts. In an affidavit of defense and counterclaim the Fleet Corporation repeated the allegations made by the Government in No. 8 and sought the same relief.

The two actions were jointly referred by the District Judge to a Master who held hearings and made findings. In No. 8, the Master recommended that the Government's bill be dismissed, and on the authority of *Nassau Smelting Works* v. *United States,* 266 U. S. 101, further recommended the Bethlehem's counterclaim be dismissed for want of jurisdiction, the amount claimed being in excess of $10,000. In No. 9, he recommended that judgment be entered for Bethlehem for $5,272,075 [7] with interest at 2% from September 1, 1922. The District Judge declined to allow any interest, applying the law of Pennsylvania as he thought our decision in *Erie R. Co.* v.

---

[7] The Government concedes "that $1,514,995 of the judgment awarded . . . in the action at law is . . . due under contracts other than those now under attack."

*Tompkins,* 304 U. S. 64, required. In all other respects he followed the Master's recommendations and rendered judgment accordingly. 23 F. Supp. 676; 26 *id.* 259. The Circuit Court of Appeals affirmed. 113 F. 2d 301. On application of the United States and the Fleet Corporation, we granted certiorari. 311 U. S. 632.

As the case reaches us, the controversy revolves primarily around the section of the contracts which sets out what is to be paid to Bethlehem. In all the contracts, that section contains substantially the following provisions:

"The price to be paid for each vessel to be constructed and furnished in accordance with the terms of this contract . . . shall be the actual cost, plus the definite sum for profit hereinafter in this Article provided for, based upon an estimated actual cost to the Contractor . . . Should the actual cost be less than the estimated . . . cost . . . the Contractor shall be allowed as profit on each vessel in addition to said fixed sum for profit . . . one-half the amount by which such actual cost of each vessel falls short of the estimated cost . . ."

Thus, a high estimated cost would increase the probability of "savings" to be divided between Bethlehem and the Government. And the more the estimated cost exceeded actual cost, the greater would be Bethlehem's share. It can be seen, therefore, that the estimated cost agreed upon by the parties is a pivotal figure.

I

The Government charged Bethlehem with fraud in submitting estimated cost figures which were adopted in the contracts. It was alleged that Bethlehem's agents made two false representations: (1) that it was impracticable to estimate closely what the cost would be and (2) that the estimates Bethlehem submitted, and which the Fleet Corporation accepted, were fair and reasonable under the

circumstances. The Master found that there was no evidence to support this charge of fraud. The District Judge approved this finding as did the Circuit Court of Appeals, which said that it had "carefully considered the record in the light of this contention [of fraud]" and concluded that "the estimates submitted by Bethlehem and prepared for it by its representative Brown were fairly and honestly made and as accurate as could be expected under the uncertain conditions then prevailing." And in this Court the petitioner accepts these findings. Therefore, in considering other attacks upon Bethlehem's right to recover, we must do so on the assumption that there was no fraud in Bethlehem's negotiations with the Government.

## II

The Government contends that even in the absence of fraud, Bethlehem is entitled to nothing by virtue of the half-savings clauses.

One argument is that the contracts gave Bethlehem the benefits of participating in the savings only if Bethlehem by special efforts increased its efficiency and brought actual costs below the estimates agreed to in the contracts.

Neither the specific language of the half-savings provision nor its context supports this contention. On its face, the provision contains an unconditional promise to pay Bethlehem one-half of the difference between the actual and estimated cost of the ships in question. That such a method of computation would tend to discourage careless expenditures and encourage vigorous attempts at realizing economies in building the ships is hardly debatable. But the half-savings clause does not impose any positive obligations upon the builder. The Master found, upon consideration both of the terms of the contracts and testimony on the understanding of the parties, that a showing of savings, without more, obligated the Government to share them with Bethlehem. It cannot be main-

tained that this finding, accepted by both courts below, is without ample support.

Nothing in the negotiations between the parties as revealed in the record indicates that they had a contrary understanding of the contracts. Bethlehem held out against the Fleet Corporation's early insistence upon lump sum contracts. It continually asserted that uncertainties about final cost due to rapidly rising prices would require it to protect itself by insisting upon a figure too high for the Fleet Corporation's acceptance and therefore itself proposed the cost-plus-fixed-fee-plus-half-savings method of determining compensation. While there seems to have been recognition that this method might induce greater efforts at efficiency, which would be to the advantage of both parties, there is not the smallest hint that either Bethlehem or the Government regarded the substitution of this method as imposing any positive obligations upon Bethlehem in addition to those it would have had under lump sum contracts.

In the alternative, the Government urges that the half-savings clauses are severable, and that if the contracts imposed upon Bethlehem no obligation of special effort to effect savings, these clauses were unsupported by consideration, and are therefore unenforceable. The Master and the courts below, however, treated these clauses as non-severable; to do otherwise would call for departure from accepted principles of the law of contract. Whether a number of promises constitute one contract or more than one is to be determined by inquiring "whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out." Williston on Contracts (rev. ed.) § 863 and cases there cited. The record makes it clear that each of the contracts here was assented to as a single whole, and that consummation of a bargain between the parties depended upon inclusion of

the half-savings clause. Furthermore, we know of no federal or state statute or established rule of law in any jurisdiction inconsistent with the elementary proposition that a promise to build ships is good consideration for a promise to pay a sum of money whether fixed in amount or depending upon the relationship between actual and estimated cost.[8] Cf. *Dayton Airplane Co.* v. *United States,* 21 F. 2d 673, 682–683.

### III

The Government further argues that if the half-savings clauses must be taken as permitting Bethlehem to participate in savings however caused, the contracts are invalid because unconscionable. Without specifying that it relies on the law of any particular jurisdiction, the petitioner rests its argument on an asserted general doctrine of unconscionability at common law. Since there is no governing constitutional or federal statutory provision, if these were contracts between private individuals, the law of some locality would be controlling. *Erie R. Co.* v. *Tompkins, supra.* Whether the same rule would apply to government contracts in general or to the contracts of the Fleet Corporation [9] in particular, we need not decide. Nor, assuming the applicability of the

---

[8] Of the cases called to our attention by the Government, only in *Burke & James, Inc.* v. *United States,* 63 Ct. Cls. 36, was a bonus for savings clause held severable and invalid although regarded as "part and parcel of the original . . . contract." We agree, as did both courts below, with the Master's statement that the *Burke* case is not applicable here because "the facts upon which the decision of that case was based are so different."

[9] The District Court treated the contracts as governed by the law of Pennsylvania. The Circuit Court of Appeals treated them as governed by the law either of Pennsylvania or the District of Columbia, but did not decide which. The Fleet Corporation was organized under the laws of the District of Columbia. Although wholly owned and controlled by the Government it has been held subject to suit, in

*Tompkins* case to the contracts before us, would we have to determine whether the law of the District of Columbia or of some particular state is decisive. For, in invoking the asserted doctrine of unconscionability claimed to be applicable here, the Government relies entirely upon the alleged existence of two elements: duress, and profits grossly in excess of customary standards. And for reasons we shall set out, neither of these two elements exists here.

*Duress.* The word duress implies feebleness on one side, overpowering strength on the other. Here it is suggested that feebleness is on the side of the Government of the United States, overpowering strength on the side of a single private corporation. Although there are many cases in which an individual has claimed to be a victim of duress in dealings with government, *e. g., Union Pacific R. Co.* v. *Public Service Comm'n,* 248 U. S. 67, this, so far as we know, is the first instance in which government has claimed to be a victim of duress in dealings with an individual.

The argument by which the petitioner seeks to establish that the contracts were made under duress is essentially this: Germany's submarine warfare made it imperative that the Government secure the greatest possible number of ships in the shortest possible time; there was a scarcity of ships and shipbuilding facilities in the United States; Bethlehem, the largest shipbuilder in the world, not only had shipbuilding facilities available, but also a trained organization; at a time when Bethlehem's facilities and trained organization were vital to the prosecution of the war, it declined to accept terms proposed by the Government, but insisted upon prices which some of

---

either state or federal courts. *Sloan Shipyards Corp.* v. *U. S. Fleet Corp.,* 258 U. S. 549; *U. S. Shipping Board Merchant Fleet Corp.* v. *Harwood,* 281 U. S. 519.

the Government's representatives thought too high; although Congress had authorized the Executive to commandeer shipbuilding facilities if necessary, Bethlehem's organization was also needed and the Government was without power to compel performance by an unwilling organization; the Government therefore had to accept contracts on whatever terms Bethlehem proposed or, doing without the ships which Bethlehem could produce, run the risk of military defeat.

Two basic propositions underlie this argument: (1) The Government's representatives involuntarily accepted Bethlehem's terms. (2) The circumstances permitted the Government no other alternative.

Upon reviewing the negotiations between the representatives of the Government and the representatives of Bethlehem, we cannot find support for the first proposition. The Master found, and the courts below agreed, that "the contracts resulted from negotiations in which both parties were represented by intelligent, well informed and experienced officers whose sole object was to make the best trade possible, under conditions which included the uncertainties of war-time contingencies, the results from which were not and could not have been known at the time the contracts were made." Two of the three principal negotiators for the Fleet Corporation have testified in the proceedings before the Master. It is abundantly clear from their testimony that, during the course of the negotiations, they did not consider themselves compelled to accept whatever terms the other side proposed. In the disposition of the two main differences between the negotiators, there is no evidence of that state of overcome will which is the major premise of the petitioner's argument of duress. Cf. *French* v. *Shoemaker*, 14 Wall. 314, 332.

One of the differences was settled by the Government's abandonment of its earlier insistence upon a lump sum arrangement together with a guaranteed date of delivery.

In view of the rising prices and unpredictable labor supply of the time, Bethlehem's reluctance to enter into contracts on such terms does not seem unreasonable.[10] And if the Government's abandonment of its position is to be regarded as evidence of compulsion, we should have to find compulsion in every contract in which one of the parties makes a concession to a demand, however reasonable, of the other side.

The other major difference between the negotiators was on the matter of price. There is evidence that some of the Fleet Corporation's representatives considered Bethlehem's demands high, but we cannot conclude that the figure finally accepted by the Fleet Corporation was accepted because its representatives felt themselves powerless to refuse. On the contrary, Bethlehem by letter voluntarily offered to accept contracts on terms to be fixed by the Fleet Corporation's general manager. This offer was rejected, one of the Fleet Corporation's negotiators testifying that it preferred to make contracts rather than assume the attitude of dictating terms. Moreover, the general manager of the Fleet Corporation, in whom final authority was vested and who approved these contracts, was of the opinion that high estimated cost figures would be advantageous to the Government because "care must be exercised that they be not placed at too low a figure, for if they are, the probabilities are that the contractor will lose interest in keeping the cost down." And one of the negotiators for the Fleet Corporation has given testimony that he was not so much concerned with cost as with speed of production, since "legislation was already in the offing in the form of war profit taxes . . . to take care of extreme

---

[10] Cf.: "Obviously no sane man would bid on a lump-sum contract under such conditions, unless perchance he should treat the matter as a pure gamble and include an excessive margin in his proposal for unforeseen contingencies." Report of Chief of Construction Division, War Department Annual Reports (1919) 4147.

cases." We must therefore conclude that the negotiations do not show that Bethlehem forced the Government's representatives to accept contracts against their will.

If the negotiations do not establish duress, the Government finds it in the circumstances themselves. The petitioner concedes that the Government could have commandeered Bethlehem's plants, but it contends that, if the plants had been commandeered, Bethlehem's organization would have been unwilling to serve the Government in them. Heavy reliance is placed on an observation in the Master's report that "the Government did not have power to compel performance by an unwilling organization." We shall later consider the alleged lack of power. We now point out that the alleged unwillingness is an assumption unsupported by findings or evidence. Since the possibility of commandeering appears not even to have been suggested to Bethlehem, we have no basis for knowing what its reaction would have been. We cannot assume that, if the negotiations failed to produce contracts acceptable to both sides, Bethlehem would have refused to contribute to the war effort except under legal compulsion. We cannot lightly impute to Bethlehem's whole organization, composed as it was of hundreds of people, such an attitude of unpatriotic recalcitrance in the face of national peril.

But even if we were to assume, as we do not, an initial attitude of unwillingness, we do not think that the Government was entirely without means of overcoming it. For, the representatives of the Fleet Corporation, an agent of the United States, came to Bethlehem armed with bargaining powers to which those of no ordinary private corporation can be compared. If it chose to, the Fleet Corporation could have foregone all negotiation over price, compelling Bethlehem to undertake the work at a price set by the President, with the burden of going to court if it considered the compensation unreasonably low. And the

power to commandeer Bethlehem's entire plant and facilities, in accordance with authority specifically delegated by the President, provided the Fleet Corporation with an alternative bargaining weapon difficult for any company to resist.

The Government nevertheless urges that the circumstances here are analogous to those under which courts of admiralty have held contracts to be unenforceable. In particular, it points to the principle that courts of admiralty "will not tolerate the doctrine that a salvor can take the advantage of his situation, and avail himself of the calamities of others to drive a bargain; nor will they permit the performance of a public duty to be turned into a traffic of profit." *Post* v. *Jones,* 19 How. 150, 160. We think this principle has no real relevance to the case before us.

In the first place, if there was a "traffic of profit" here, it was not the unanticipated result of an accident as in the salvage cases. When Congress authorized the procurement of ships through ordinary commercial negotiations, it must have known that the purchases could not be made in a market of open competition, because existing shipbuilding facilities would be overtaxed by the construction program. See Department of Commerce, Government Aid to Merchant Shipping (rev. ed. 1923) 433; Hearings before House Committee on the Merchant Marine and Fisheries on H. R. 10500, 64th Cong., 1st Sess., *passim.* And Congress must have anticipated that, in the contracts agreed upon, profits would be expected, and that the self-interest inherent in commercial transactions would make itself felt. Therefore, in seeking to establish duress from the circumstances in which these contracts were made, the Government is relying on the identical circumstances which were in existence at the time Congress chose the policy of authorizing procurement of ships through com-

mercial negotiation. We cannot now invalidate contracts made pursuant to a Congressionally selected policy, on the sole ground of the coercive effect of circumstances which Congress clearly contemplated. To do so we should have to repudiate legislative power exercised in proper constitutional sphere.

In the second place, the captain of a ship in distress on the high seas who is completely at the mercy of his salvor cannot be likened to a sovereign power dealing with an individual contractor. We cannot regard the Government of the United States at war as so powerless that it must seek the organization of a private corporation as a helpless suppliant. The Constitution grants to Congress power "to raise and support Armies," "to provide and maintain a Navy," and to make all laws necessary and proper to carry these powers into execution. Under this authority Congress can draft men for battle service. *Selective Draft Law Cases,* 245 U. S. 366. Its power to draft business organizations to support the fighting men who risk their lives can be no less.

*Profits.* The general common law rule of unconscionability on which the petitioner relies is said to deny enforcement to contracts when the profits provided for are grossly in excess of a standard established by common practice. Whether there is such a rule, what is its scope, and whether it is part of the body of law governing these contracts, we need not decide. For, high as Bethlehem's 22% profit seems to us, we are compelled to admit that so far as the record or any other source of which we can take notice discloses, it is not grossly in excess of the standard established by common practice in the field in which Congress authorized the making of these contracts. And in particular, it may be added, the Master found that the ships built by Bethlehem cost the Government less than comparable ships built by other shipbuilders. The Gov-

ernment made no attempt to establish, nor is there any indication in the record, that the profits realized by other shipbuilders were any less than Bethlehem's.

To establish a standard of customary profits, the petitioner points to the experience of the Navy and War Departments and other branches of the Government in connection with straight cost-plus contracts. Because 10% was the profit specified in many such contracts, the Government asserts that it is an appropriate figure here, and urges that the profits on these contracts, tested by such a standard, cannot be allowed. The relevance of experience with cost-plus contracts to the contracts here is not clear. The Shipping Board deliberately chose to avoid cost-plus contracts where possible, having found them unsatisfactory in practice. Moreover, the record shows that the total cost to the Government of comparable ships under cost-plus contracts was higher than the total cost of the ships Bethlehem built under the contracts here in question. And experience in many fields has demonstrated that the percentage of profit actually realized under cost-plus contracts is likely to be far more than the percentage specified. As stated in 1918 by Charles E. Hughes, later Chief Justice, in his report to the Attorney General on the aircraft industry, "contracts of this sort lead to waste, foster abuses, and impose an almost intolerable burden of cost accounting, in itself a hindrance to rapid production." Report to the Attorney General on the Aircraft Inquiry (1918) 134. See also, Expenditures in the War Department—Camps, House Report No. 816, 66th Cong., 2d Sess., 49–53. The 10% which the petitioner derives by reference to the cost-plus contracts of certain governmental departments cannot be taken as a standard of common practice. It is an illusory figure without basis in the realities of business experience.

If profits earned under Government contracts in general are taken as the standard of comparison, the 22%

claimed here is overshadowed in too many instances for it to be regarded as extraordinary. The Hughes report referred to above, for example, points out (pp. 136–146) that most of the airplane production during the last war was under contracts providing for much higher profits. To take an example of the profits made on food products, the Federal Trade Commission determined that, in 1917, profits on the sales of salmon canneries, a major portion of whose output was purchased by the Government, ranged from 15 to 68% of cost, averaging 52%.[11] Federal Trade Commission, Report on Canned Salmon (1918) 63. In the shipbuilding industry itself, even in peace times, profits were found by a special committee of the Senate, which investigated the munitions industry, to have been from 25% to 37% on the cruisers built in 1927, about 22% in 1929, and of like range for other years. Senate Report No. 944, 74th Cong., 1st Sess., 4.

If the comparison is made with industrial profits, not limited to profits on Government contracts alone, the 22% asked for here likewise loses all claim to distinction. An exhibit, the accuracy of which the Government has not challenged, incorporated into the record of this case, indicates that in terms of profit on gross sales, the largest American steel company made 49, 58, and 46% during the years 1916, 1917, and 1918. As computed by the Federal Trade Commission, net earnings in 1917 of the same company on all its business were 25% of total investment, and the Commission cites instances of other steel companies whose earnings thus measured ranged from 30 to 320%. Federal Trade Commission, Letter on Profiteering (1918) 9. Profits of lumber producers, again in terms of return

---

[11] The Federal Trade Commission Report does not give separate figures on sales to the Government, but points out (p. 7) that the Government had announced its intention to purchase 80% of the 1918 pack.

on investment, ranged as high as 121%; and of producers of petroleum products, as high as 122%, over half of the industry earning more than 20%. *Id.* 12, 13. During the first six months of 1917, one of the two major sulphur producers in the country sold its product at an average price of $18.11 per ton, more than 200% above cost, which was $5.73 per ton; the other major producer earned 236% on its investment during the first eleven months of the same year. *Id.* 11. The Federal Trade Commission's collection of data for various other industries, a collection which the Commission stated was "by no means a complete catalog," affords many additional examples of the same kind. But further confirmation should be unnecessary for a conclusion no businessman would question: that the profits claimed here, seen in their commercial environment, cannot be considered exceptional.

The profits claimed here arise under contracts deliberately let by the Fleet Corporation under authority delegated by the President in accordance with an act of Congress. Neither Congress nor the President restricted the freedom of the Fleet Corporation to grant measures of profits common at the time. And the Fleet Corporation's chosen policy was to operate in a field where profits for services are demanded and expected. The futility of subjecting this choice of policy to judicial review is demonstrated by this case, coming to this Court as it does more than twenty years after the ships were completed. In any event, we believe the question of whether or not this policy was wise is outside our province to decide. Under our form of government we do not have the power to nullify it, as we believe we should necessarily be doing, were we to declare these contracts unenforceable on the ground that profits granted under Congressional authority were too high. The profits made in these and other contracts entered into under the same system may justly arouse indignation. But indignation based on the no-

tions of morality of this or any other court cannot be judicially transmuted into a principle of law of greater force than the expressed will of Congress.[12]

## IV

The problem of war profits is not new. In this country, every war we have engaged in has provided opportunities for profiteering and they have been too often scandalously seized. See Hearings before the House Committee on Military Affairs on H. R. 3 and H. R. 5293, 74th Cong., 1st Sess., 590–598. To meet this recurrent evil, Congress has at times taken various measures. It has authorized price fixing. It has placed a fixed limit on profits, or has recaptured high profits through taxation. It has expressly reserved for the Government the right to cancel contracts after they have been made. Pursuant to Congressional authority, the Government has requisitioned existing production facilities or itself built and operated new ones to provide needed war materials. It may be that one or some or all of these measures should be utilized more comprehensively, or that still other measures must be devised. But if the Executive is in need of additional laws by which to protect the nation against war profiteering, the Constitution has given to Congress, not to this Court, the power to make them.

*Affirmed.*

The CHIEF JUSTICE and MR. JUSTICE JACKSON, who as former Attorneys General actively participated in the prosecution of these cases, take no part in this decision. MR. JUSTICE ROBERTS also takes no part in the decision.

---

[12] Cf.: "It would be very dangerous, indeed, to the best interests of the government . . . if . . . this [Court] should . . . render decrees on the crude notions of the judges of what is or would be morally right between the government and the individual." *Smoot's Case,* 15 Wall. 36, 45–46.

MR. JUSTICE MURPHY, concurring:

I concur in the opinion of the Court insofar as it relates to duress and coercion and the non-severability of the "bonus for savings" clauses, but desire to add a brief further statement of my views.

In voting for affirmance of the judgment, I do not wish to be understood as expressing approval of an arrangement like the one now under review, by which a company engaged in doing work for the Government in time of grave national peril—or any other time—is entitled to a profit of 22 per cent. under contracts involving little or no risk and grossing many millions of dollars. Such an arrangement not only is incompatible with sound principles of public management, but is injurious to public confidence and public morale. The fact that such cases were common during the last war, as evidenced by the circumstances recited in the opinion of the Court, provides no justification to my mind for such a practice then or now. No man or set of men should want to make excessive profits out of the travail of the Nation at war, and government officials entrusted with contracting authority, and the Congress bestowing such authority, should be alert to prevent it.

The question before the Court for decision, however, is not whether an arrangement like the one presented for review accords with our conceptions of business morality or with correct administration of the public business. Having made a bargain, the Government should be held to it unless there are valid and appropriate reasons known to the law for relieving it from its obligations. It is the duty and responsibility of the courts, not to re-write contracts according to their own views of what is practical and fair, but to enforce them in accordance with the evidence and recognized principles of law.

In my opinion the elements of duress and coercion have not been established in this case. The doctrine that

"necessitous men are not free men," a doctrine evolved by the English courts of chancery in the eighteenth century for the protection of harassed debtors,[1] is not applicable to the Government of the United States, armed as it is with both an actual and a potential arsenal of powers adequate to protect its interests in dealings with private persons.

I am also of opinion that the "bonus for savings" clauses are integral parts of the contracts in question and part of the entire consideration moving to Bethlehem in exchange for its promise to build ships. To characterize these clauses as severable and supported by consideration only if Bethlehem promised to increase its efficiency is ingenious, but requires us to close our eyes to the actualities of the record before us and to ignore fundamental contract law.

Nor can I accept the proposition that the "bonus for savings" clauses are properly interpreted as meaning that Bethlehem was to receive one-half of the "savings" only insofar as Bethlehem could prove that the "savings" were due to its increased efficiency. Such an interpretation, it is true, would prevent Bethlehem from benefiting by reason of purely fortuitous "savings." However, in the absence, as here, of fraud, mistake, or that overreaching which we label "duress" and "coercion," contracts should be interpreted as they are written, not as they might or should have been written in the light of after-thought and subsequent experience. The language of the "savings" clauses does not limit Bethlehem's participation in "savings" to those attributable only to its own efforts. The Master found that "Bethlehem was to participate in savings however earned." The suggested interpretation, ignoring the language of the contracts and the expressed

[1] *Vernon* v. *Bethell,* 2 Eden 110, 113. And see *Wood* v. *Abrey,* 3 Maddock's Chan. 216; *Underhill* v. *Horwood,* 10 Ves. Jr. 209.

understanding of the parties, gratuitously rewrites the contracts to accord with notions of fairness acquired in the light of subsequent developments.

It is understandable that one may be indignant at Bethlehem's claim, but such indignation does not justify the distortion of established legal principles to relieve the Government of its approval of a hard bargain. It cannot be left out of consideration that the Government entered into the agreements with full understanding of their terms. Surely there is much to be said in favor of the Government's standing behind obligations, even though quite onerous, which it incurred with knowledge of the circumstances. The possibility that the Government may be relieved of bargains twenty-four years after agreeing to them is not conducive to mutual trust and confidence between citizens and their government.

The judgment should be affirmed.

Mr. Justice Frankfurter, dissenting:

The Founders divided our government into three branches, partly to prevent autocratic concentration of power and partly to achieve appropriate division of labor in the difficult task of government. The President has his duties, the Congress its duties, and we ours. What powers the Congress should give the President in order to obtain the most effective production of war supplies, how the President should exercise those powers, whether a system of private contracts for war materials is conducive to unjustifiable waste and profiteering, or whether government production of necessary war supplies is a wiser course—these and like matters are not our business and upon them we should neither express nor intimate views. However circumscribed the judicial area may be, we had best remain within it. But the function of the judiciary is not so limited that it must sanction the use of the federal courts as instruments of injustice in dis-

regard of moral and equitable principles which have been part of the law for centuries. I am compelled, therefore, to dissent from the judgment of the Court.

In the summer of 1917 the United States was at war with Germany. The enemy's submarine was taking terrific toll of our shipping. The immediate threat to our national security had to be met promptly. Congress enacted the Emergency Shipping Fund Act of June 15, 1917, 40 Stat. 182, conferring vast powers upon the President. He was authorized to place orders for such ships or material as "the necessities of the Government" may require; to modify, suspend, cancel or requisition contracts for the building, production, or purchase of ships or material; and to take over any plants and ships constructed or in the process of construction. If any person owning any ship, plant, or material refused to build or sell ships or material ordered by the Government "at such reasonable price as shall be determined by the President," he was empowered to take possession of the ships, material, or plant of such person.

On July 11, 1917, the President delegated all the authority vested in him by this Act to the United States Shipping Board Emergency Fleet Corporation. A stupendous task was thereby imposed upon the Fleet Corporation. "The program of construction, as well as operation was gigantic. It involved an expenditure of more than three and a half billion dollars, a sum greater than any expended by any corporation in a similar period of time. Many of the officials and board members were without experience in either shipbuilding or operation. No adequate organization existed at the beginning. A complete organization to carry out its large program had to be created. There was a shortage of shipbuilding skill as well as shipbuilding facilities. The need for ships was imperative and constantly increased during the combat period." Report of the Select Committee on U. S. Ship-

ping Board Operations, H. Rep. No. 1399, 66th Cong., 3d Sess., p. 24.

Bethlehem was the largest shipbuilding company in the world. Its five subsidiaries and their plants were experienced shipbuilders, with efficient and well-equipped organizations. As the Master in this case found, "it was understood by all parties concerned that the Fleet Corporation shipbuilding program would call for capacity production at each of Bethlehem's shipyards." Of course the Government had the power to take over Bethlehem's shipyards and plants. But the United States was at war. It needed ships—and it needed them at once. The shipyards and plants of a recalcitrant shipbuilder would not produce the necessary tonnage, at least not in the needed time, without an organization able to operate them at maximum efficiency. The Master found that "A failure to induce Bethlehem to undertake the shipbuilding program covered by these contracts, followed by the taking possession by the Fleet Corporation of the Bethlehem plants, could not have accomplished the desired result. It was Bethlehem's organization that was necessary to insure success to the shipbuilding program of the Fleet Corporation and, as the Government did not have power to compel performance by an unwilling organization, if Bethlehem demanded its price on the basis of substantial commercial profits rather than contribute such services on a patriotic basis, the Government was obliged to take the contracts on such basis or not at all."

Bethlehem does not deny that in these negotiations the Government's legal power to requisition its shipyards was, for purposes of bargaining, an empty weapon. "It is also true," Bethlehem admits, "that, although the Fleet Corporation had the power to take over Bethlehem's yards, what it really required for the carrying out of its program was the use of Bethlehem's organization—its knowledge of how to build ships.". The representatives

of both Bethlehem and the Fleet Corporation knew that the Government did not regard its power to requisition plants and shipyards as a satisfactory alternative to making contracts with private shipbuilders for the construction of ships.[1]   It is not for us to say that the Government should not have determined upon such a policy.   It is enough that when these contracts were made, none of the parties believed that there was open to the Government the feasible alternative which now, twenty-five years later, this Court says was open to it.

This was the setting in which the contracts in suit were made.   Bethlehem was represented throughout the negotiations by Joseph W. Powell, its vice president and operating manager, and Harry Brown, its technical manager, described by the Master as "two of the ablest and most experienced shipbuilders and estimators of shipbuilding costs in the United States."   On behalf of the Fleet Corporation the active negotiators were Admiral E. T. Bowles, manager of its division of steel ship construction, and G. S. Radford, manager of its contract

[1] Whatever the scope and importance of the Government's requisitioning power in other situations (compare Baruch, American Industry in War, p. 77, with Sen. Rep. No. 944, 74th Cong., 1st Sess., pt. 2, pp. 4–5, 111–15), it was without significance in the Fleet Corporation's shipbuilding program.   The reports of the Shipping Board show that the exercise of the power was limited to the acquisition of vessels which had been built or were being constructed; the power does not seem to have been employed to take over the shipyards of recalcitrant private contractors.   Indeed, the policy of the Government, based upon its wartime needs, was to encourage, financially and otherwise, the construction and maintenance of shipyards by private interests.   See 1st Annual Report of the U. S. Shipping Board (1917) pp. 12–15; 2d Annual Report (1918) pp. 33–36, 120–22; Report of Director General Charles Piez to the Board of Trustees of the U. S. Shipping Board Emergency Fleet Corporation (April 30, 1919) pp. 13–14, 78, 123; Report of the President of the U. S. Shipping Board Emergency Fleet Corporation to the Board of Trustees (August 1, 1919) pp. 25–26.

division. The Master characterized Bowles and Radford as "equally competent shipbuilding experts." However, they were not empowered to conclude contracts on behalf of the Fleet Corporation. That ultimate authority belonged to Charles Piez, the vice-president and general manager of the Fleet Corporation. Piez was a business man who had had no previous shipbuilding experience, and the Master found that "At the time of the negotiations relating to the contracts in controversy, the relations between Powell and Piez were very close. Piez, as Powell knew, had had no shipbuilding experience whatsoever, had implicit confidence in Powell's integrity and shipbuilding ability and experience, and was accustomed to look to him for information and assistance with respect to matters of shipbuilding."

Following a conference in Washington on June 15, 1917, attended by Powell and other shipbuilders, the General Manager of the Fleet Corporation requested Bethlehem to submit formal proposals for the construction of ships. Throughout the entire negotiations which followed, the Fleet Corporation tried to persuade Bethlehem to enter into "lump-sum" contracts. Powell refused, insisting upon the so-called "half-savings" form of contract which he had originated. He set forth his proposals in his letter of December 13, 1917, to the Fleet Corporation: "Because of the unprecedented conditions surrounding the Labor and Material market, it is impracticable to estimate within a reasonable percentage what will be the actual cost of construction, and it is therefore impossible to submit fixed prices for any of these vessels, except upon a basis so far above estimated cost that any figure acceptable to this Company would not be acceptable to the Emergency Fleet Corporation. It is proposed, however, that they be constructed on the basis of actual cost plus a fee, with an agreed upon probable cost, this Company to be paid in addition to the fee one-half of any saving that may be

made below this cost figure, and with the further provision that the estimated cost figure will be increased due to any increase in rates of wages that may be approved by the Emergency Fleet Corporation."

After further conferences, Powell submitted a proposal, dated December 19, 1917, specifying the estimated costs and fixed fees of the vessels to be constructed. On the morning of January 3, 1918, before the Fleet Corporation had expressed any views on the proposal of December 19, Powell handed Piez a letter, dated January 3, 1918, offering to construct a greater number of vessels than was specified in his earlier proposal. The letter concluded "that while this company cannot undertake any capital expenditures at its expense, if the terms in our proposal do not otherwise meet with the Emergency Fleet Corporation's approval, we are prepared to accept the order to construct these vessels on such terms as may be personally determined by Mr. Charles Piez, the Vice President and General Manager, and strongly urge there be no delay in placing this order, as we are making this offer because of our knowledge of the vital emergency now confronting this nation in connection with the requirements for additional merchant vessels."

Upon receipt of this letter, Piez arranged a conference between Powell, Brown, Bowles, and Radford, which occurred on the afternoon of January 3. But Bowles and Radford did not know, and neither was informed, before or during the conference, of the offer made to Piez in Powell's letter of January 3. It can hardly be said, therefore, that this letter, neither addressed to nor made known to the real negotiators for the Government, was a factor in their negotiations.

At the conference, which lasted about five hours, Bowles again attempted to persuade Powell to undertake the construction upon a lump-sum basis. Powell was adamant, however, and Bowles had to acquiesce in the half-savings

form of contract in order to reach any agreement. Powell insisted that the estimates previously submitted by Bethlehem were fair and reasonable. Neither Bowles nor Radford submitted any estimates or counter-proposals, "their criticism being limited to the opinion expressed by Bowles that the original and reduced estimates submitted by Powell were too high." Powell made several reductions in the estimates, and in response to Bowles' inquiry, Brown assured him that the estimates were about as accurate as could be made under the circumstances. Bowles and Radford thereupon agreed to the prices, subject to confirmation by Piez. On the same day they handed Piez the following memorandum:

"We hand you herewith the Bethlehem Shipbuilding Corporation's proposal dated December 19, for additional construction at their various plants, amounting in all to 19 vessels, exclusive of tugs. It may be noted that, with the exception of three ships, the vessels in question are troop ships and tankers—ships of a type that only real shipbuilders can produce satisfactorily. As is well known, we have been having difficulty in placing such vessels.

"We wish to place on record the fact that the Bethlehem Shipbuilding Corporation's representatives have insisted on comparatively high prices for these vessels; that they have only with difficulty been persuaded to quote us on the types of ships referred to; and, that their attitude has been characterized by an arbitrary refusal to guarantee or stand behind delivery dates. In other words, it was difficult to persuade them to quote even a tentative delivery date, and they refused positively to accede to a bonus and penalty clause for delivery.

"The letter herewith, addressed to the Bethlehem Shipbuilding Corporation, in reply to their proposal, has been prepared for your signature and is now presented with the recommendation that it be signed. While the prices we have agreed to, with representatives of the Bethlehem

Shipbuilding Corporation, are not satisfactory to us, nevertheless, they represent a material reduction from the prices quoted by that Corporation. Realizing that the Nation will need these vessels, we have been actuated by the belief that further delay in placing the contracts should be eliminated and we believe that we have made the best compromise possible under very difficult conditions."

As a consequence of these negotiations, the thirteen contracts here in controversy were executed, seven on February 1, 1918, and six thereafter.

The provisions of these contracts demand careful analysis. The contract marked No. 183, calling for the construction by Bethlehem of three steel tank vessels each weighing about 9,100 tons, is typical.

In order to provide the sums necessary for carrying on the work under the contract, the Fleet Corporation agreed to deposit in advance "such sums as may be necessary to constitute and to keep constituted a fund from which to finance the work, to provide for payments to be made for materials, and for wages and salaries of persons employed upon the work hereunder." The Fleet Corporation agreed also to assist Bethlehem "to secure with the utmost practicable expedition and at the minimum cost consistent with the existing conditions, the facilities, utilities, parts, materials and supplies required for the work under this contract." The price to be paid for each vessel was defined to include (a) the "actual cost," plus (b) a fixed fee of $185,000, plus (c) one-half the amount by which the actual cost of each vessel should fall short of an estimated cost of $1,865,000.

It would be difficult to draft a more inclusive definition of "cost" than that contained in this contract. "Actual cost" was defined to include the following items, as well as "items similar thereto in principle": (a) the net costs of labor (including bonuses), materials, machinery, equipment, and supplies furnished by Bethlehem, and all other

direct charges, such as insurance on the vessels, etc.; (b) a "proper proportion" of running expenses, including rentals, cost of repairs and maintenance, light, heat, power, insurance, management, salaries (including bonuses), and all other indirect charges; (c) a "proper proportion" of interest accrued on bonds, loans, or other debts existing or previously made, the proceeds of which "shall be used, or shall have been or shall be invested in plant, equipment, etc., that shall be used," in the performance of the contract; (d) a "proper proportion" of taxes of all kinds, except federal taxes, with respect to the business or property; (e) a "proper proportion" of physical losses sustained in connection with the construction of the vessels under the contract, including losses from fire, flood, storm, riot, vandalism, acts of God, acts of war, or other casualties; and (f) a "reasonable" allowance for depreciation of property and plants used in connection with the construction under the contract.

The Master found that, under the "half-savings" clause, Bethlehem was entitled to receive one-half the difference between the estimated cost and the actual cost, regardless of how this difference was achieved. Bethlehem was therefore not required to show that the "savings" were attributable to its efforts to increase efficiency.

Since the estimated costs of construction specified in the contracts are crucial in fixing the extent of Bethlehem's profits, it is necessary to consider how they were determined. According to the explanation furnished by Bethlehem, Brown prepared the estimated costs specified in Bethlehem's letter of December 19, 1917, as follows: As the basis of his estimate he took the cost of constructing Hull 253, a 9,100 ton tanker which had recently been completed at the Fore River yard. The cost of the material in Hull 253 was about $389,000, consisting of $150,000 for the steel structure and $239,000 for the remaining material. Brown estimated that the cost of the material

in a similar tanker to be constructed in 1918 would be $817,000, including $399,000 for the steel structure and $418,000 for the remainder. His estimate assumed an increase in freight rates and costs of delivery of 42%. The next item was the cost of labor, which on Hull 253 amounted to 38.75 cents per hour. Brown assumed that wage scales would rise to 50 cents per hour, an increase of 29%, and that efficiency would decrease about 30%. Therefore, he estimated a total labor cost of $548,000, as compared with the actual labor cost upon Hull 253 of $326,000. Similarly, the estimates of plant operating expenses were computed on the basis of equally large assumed increases. The total estimated cost of material, labor, operating expenses, and overhead amounted to $1,694,000, to which Brown added a flat 10% allowance to cover items such as armed guard equipment and "to make allowance for other contingencies," making a total estimated cost of $1,863,-000, or approximately $205 per ton. To this figure Powell added an additional $10 per ton because, as he testified, "there was an item of increased cost of steel, which represented a contract for very high-priced steel that we had to use in connection with this program, and which amounted to about $2.50 a ton spread over the program that we expected to undertake. That was a very rough figure. Whatever else I put on I put on because I knew I was going to have to trade the final contract out with Admiral Bowles and I knew I would not get what I asked for, and if I did not ask for more than I expected I would not get out where I wanted to be." Brown testified that "He [Powell] took the figures that I gave him and added $10 a ton to it" for some reason which he could not recall.

The estimated cost finally specified in the contract for the construction of the three vessels was $1,865,000; the estimated cost of such vessels proposed in Powell's letter of December 19, 1917, was $1,983,800, a difference of $118,-800, or less than 6% of the proposed estimate.

The Master found that, during the negotiations, the Fleet Corporation was uninformed as to the probable cost of materials and labor, Bethlehem's overhead and operating expenses, and depreciation and similar charges. Consequently, at the conference of January 3, 1918, from which emerged the contracts in controversy, the representatives of the Fleet Corporation did not submit any counter-offers to Bethlehem; they merely insisted that Bethlehem's estimates were too high. Brown's testimony is illuminating as to the nature of the bargaining at the conference:

"Q. Now I am asking you whether with respect to those vessels Admiral Bowles submitted any price of his own?

"A. No, sir.

"Q. Did he ask you how your estimates were made up?

"A. No, sir.

"Q. Did he ask you to justify your estimates in any way?

"A. No, sir.

"Q. He just objected to them repeatedly and said they were too high?

"A. Yes, sir.

"Q. But did not ask you to justify them?

"A. No, sir.

"Q. Until Powell finally came down to a figure which Bowles was willing to accept?

"A. Well, I should put it this way; to a figure which Mr. Powell refused to go below."

The total estimated costs of construction in the thirteen contracts in controversy amounted to $119,750,000. The total actual costs, as defined in the contracts, were $92,990,521. The estimated costs therefore exceeded the actual costs by $26,759,479, or, to put it another way, the estimated costs were almost 29% greater than actual costs. Nowhere in the long record, as the Master found, is there any explanation or justification for the tremendous dis-

parity between the estimated costs submitted by Bethlehem, or those specified in the contracts, and the actual costs.

Bethlehem's profits under these contracts amount to approximately $24,000,000, or about 22% of actual costs including extra work. In two of these contracts, Nos. 191 and 226, its profits exceed 34% and 32%, respectively. Moreover these figures do not include the profits made by Bethlehem Steel Company, an affiliate, on the sales to Bethlehem at the maximum prices permitted by the War Industries Board of 43,000 tons of steel used in the construction of ships under these contracts.

To speak of Bethlehem's profits as only 22% is in any event misleading. The profits are 22% of "cost," and not 22% of what might fairly be described as Bethlehem's capital investment in these contracts. For under these contracts Bethlehem took absolutely no risk of loss; in addition, the Government agreed to advance all sums necessary to finance the construction of the vessels. Even in usurious transactions the lender takes the risk of the borrower's insolvency. Here Bethlehem took no risks at all.

Bethlehem has already received from the Government the total costs of construction (including items for wage increases and extra work), plus fixed profits of $11,962,400 (representing about 11% of the actual costs including extra charges), plus bonuses of $8,093,157 under the half-savings clause (over 7% of costs). It has thus received total profits of more than $20,000,000 under these contracts. In the present suits it is seeking additional sums of more than $7,500,000, of which about $3,800,000 represents bonuses under the contracts in question. In sustaining the judgments of the lower courts, this Court is awarding Bethlehem further profits of about 4% on these contracts.

The Master expressly found that it was essential that Bethlehem undertake to build the vessels provided for in

the contracts, and that, since the Government needed Bethlehem's organization, it had no satisfactory alternative. It had to make the contracts on Bethlehem's terms or not at all. He concluded, nevertheless, that since "the Fleet Corporation made the contracts with open eyes, although resenting the commercial attitude of Bethlehem and condemning Bethlehem for demanding its 'pound of flesh'," the contracts were enforceable by Bethlehem in the absence of any proof of fraud.

The District Court concurred in the proposition that the absence of fraud made the contracts invulnerable. But its conclusion is contradicted by its findings: "The managers for the contractor adopted the famous Rob Roy distinction who admitted he was a robber but proudly proclaimed that he was no thief. The contractor boldly and openly fixed the figures in the estimated cost so high as to give them the promise of large bonus profits. The managers for the Fleet Corporation knew that the estimate was high and why it was made high and so protested it. The reply of the contractor's managers was, 'We will take the contract with this promise of bonus profits incorporated in it but not otherwise. You take it or leave it'. Whatever wrong there was in this may have been the wrong in a daylight robbery but there was no element of deception in it." 23 F. Supp. 676, 679.

Similarly, the affirmance of the Circuit Court of Appeals appears to have been based upon the assumption that the Government's failure to show fraud was fatal: "It is of course obvious that these negotiations took place in time of war when the need of the Government for ships was extremely urgent and the necessity of reaching an agreement with Bethlehem, therefore, vital. It is equally clear that Bethlehem insisted upon assuring itself a margin of profit which in view of the necessities of the Government was so large as to indicate an attitude of commercial greed but little diluted with patriotic feeling. There is no doubt

that this attitude on the part of Bethlehem was deeply resented by the Government representatives but the latter were faced with the alternative of either agreeing to Bethlehem's terms or taking possession of its shipyards and having the Government itself construct the vessels. We think the record clearly indicates that the Government representatives felt that the latter course could not have accomplished the shipbuilding program with the speed which was essential. It was Bethlehem's existing shipbuilding organization that was necessary to insure success to the program of the Fleet Corporation. Consequently the Government representatives, feeling as they did that Bethlehem's organization was necessary to their program, were obliged to accept the terms offered by Bethlehem. This they did with full knowledge, as we have said, that the estimated cost figures included in the contracts did not represent close approximations but were so prepared as to assure to Bethlehem substantial additional profits by way of the bonus for savings. It follows that while Bethlehem may be condemned for having taken advantage of the Nation's necessities to secure inordinate profits it cannot be charged with having misrepresented the facts to the Government's representatives." 113 F. 2d 301, 305–06.

Thus, not less than six times did the Circuit Court of Appeals declare that the unconscionable terms of this contract were forced upon the Government by the dire necessities of national self-preservation. Nevertheless the Court found itself impotent to resist the demand that the courts themselves become the means of realizing these "inordinate profits." But law does not subject courts to such impotence. Courts need not be the agents of a wrong that offends their conscience if they heed the commands of law.

In England prior to 1285 (Statute of Westminster II, 13 Edw. I, c. 50) suitors were frequently "obliged to depart from the Chancery without getting writs, because there are none which will exactly fit their cases, although these cases

fall within admitted principles." Maitland, Forms of Action at Common Law, Lect. IV (1936 ed.) p. 51. Today it is held that because the circumstances of this case cannot be fitted into a neatly carved pigeonhole in the law of contracts, "daylight robbery," exploitation of the "necessities" of the country at war, must be consummated by this Court. It is said that familiar principles would be outraged if Bethlehem were denied recovery on these contracts. But is there any principle which is more familiar or more firmly embedded in the history of Anglo-American law than the basic doctrine that the courts will not permit themselves to be used as instruments of inequity and injustice? Does any principle in our law have more universal application than the doctrine that courts will not enforce transactions in which the relative positions of the parties are such that one has unconscionably taken advantage of the necessities of the other?

These principles are not foreign to the law of contracts. Fraud and physical duress are not the only grounds upon which courts refuse to enforce contracts. The law is not so primitive that it sanctions every injustice except brute force and downright fraud. More specifically, the courts generally refuse to lend themselves to the enforcement of a "bargain" in which one party has unjustly taken advantage of the economic necessities of the other. "And there is great reason and justice in this rule, for necessitous men are not, truly speaking, free men, but, to answer a present exigency, will submit to any terms that the crafty may impose upon them." *Vernon* v. *Bethell*, 2 Eden 110, 113. So wrote Lord Chancellor Northington in 1761.

The fact that the representatives of the Government entered into the contracts "with their eyes wide open" does not mean that they were not acting under compulsion. "It always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a

choice was made according to interest does not exclude duress. It is the characteristic of duress properly so called." Holmes, J., in *Union Pacific R. Co.* v. *Public Service Comm'n,* 248 U. S. 67, 70. In that case a state unconstitutionally exacted a fee for a certificate of authority to issue railroad bonds. A railroad which had paid the fee and obtained a certificate, rather than run the risk of subsequent invalidation of its bonds and imposition of serious penalties, was held to have been coerced into making the payments. In *Swift Company* v. *United States,* 111 U. S. 22, 29, the taxpayer's only alternatives were "to submit to an illegal exaction, or discontinue its business." The payment of the tax in these circumstances was held to be under duress. See also *Ward* v. *Love County,* 253 U. S. 17, 23. The courts generally regard the dilemma of the taxpayer who must either pay the taxes or incur serious business losses as a species of duress. E. g., *Morgan* v. *Palmer,* 2 Barn. & C. 729; *Ripley* v. *Gelston,* 9 Johns. 201; *Scottish U. & N. Ins. Co.* v. *Herriott,* 109 Iowa 606, 80 N. W. 665; see Notes, 64 A. L. R. 9, 84 A. L. R. 294.

Underlying all these cases is the law's recognition of a basic psychological truth. In *Atkinson* v. *Denby,* 7 Hurlst. & N. 934, 936, Cockburn, C. J., said that "where the one person can dictate, and the other has no alternative but to submit, it is coercion." See also Abbott, C. J., in *Morgan* v. *Palmer,* 2 Barn. & C. 729, 735: "But if one party has the power of saying to the other, 'that which you require shall not be done except upon the conditions which I choose to impose,' no person can contend that they stand upon anything like an equal footing." And these were decisions in days when law was supposed to be much more rigid and more respectful of forms than we now ordinarily deem just.

The fundamental principle of law that the courts will not enforce a bargain where one party has unconscionably

taken advantage of the necessities and distress of the other has found expression in an almost infinite variety of cases. See *Lonergan* v. *Buford,* 148 U. S. 581, 589–91; *Snyder* v. *Rosenbaum,* 215 U. S. 261, 265–66. Perhaps the most familiar is the situation of the mortgagor who under the pressure of financial distress conveys his equity of redemption to the mortgagee. The courts will scrutinize the transaction very carefully, *Villa* v. *Rodriguez,* 12 Wall. 323, 339, and if it appears that the mortgagee has taken unfair advantage of the other's position, the conveyance will not be enforced. Compare *Vernon* v. *Bethell,* 2 Eden 110; *Close* v. *Phipps,* 7 M. & G. 586; *Richardson* v. *Barrick,* 16 Iowa 407.

Similarly, an heir or remainderman who is compelled by financial circumstances to sell his expectancy for a song may recover it if the vendee has unduly exploited the other's distress. *Wood* v. *Abrey,* 3 Maddock's Chan. 216, 219 (where the Vice-Chancellor, Sir John Leach, said: "If a man who meets his purchaser on equal terms, negligently sells his estate at an under value, he has no title to relief in equity. But a Court of Equity will inquire whether the parties really did meet on equal terms; and if it be found that the vendor was in distressed circumstances, and that advantage was taken of that distress, it will avoid the contract."); *Underhill* v. *Horwood,* 10 Ves. Jr. 209; *M'Kinney* v. *Pinckard,* 29 Va. 149; *Butler* v. *Duncan,* 47 Mich. 94, 10 N. W. 123; *Brown* v. *Hall,* 14 R. I. 249. In *Administrators of Hough* v. *Hunt,* 2 Ohio 495, 502, a person heavily in debt, in order to obtain a further loan with which to meet debts falling due, agreed to buy land at more than double its value. The court found that the lender had unjustly taken advantage of the borrower's necessities and therefore rescinded the contract: "The rule in chancery is well established. When a person is incumbered with debts, and that fact is known to a person with whom he contracts, who avails himself of it to exact an

unconscionable bargain, equity will relieve upon account of the advantage and hardship." This was written in 1826. To the same effect are *Vyne* v. *Glenn*, 41 Mich. 112, and *Bither* v. *Packard*, 115 Maine 306, 98 A. 929.

Another class of cases in which this principle has been applied arises where a customer of a gas or electric company pays charges which he asserts he is not obligated to pay, rather than have his service disconnected. Payments made in such circumstances are regarded as coerced. See *Boston* v. *Edison Electric Illuminating Co.*, 242 Mass. 305, 310, 136 N. E. 113; *Westlake & Button* v. *St. Louis*, 77 Mo. 47; Note, 34 A. L. R. 185.

*Cobb* v. *Charter*, 32 Conn. 358, illustrates another type of controversy in which the courts have given effect to the historic principle of duress which is now seemingly rejected as an innovation. The defendant there had possession of a chest of tools belonging to the plaintiff, a mechanic. He refused to give up the chest, which the plaintiff needed in order to ply his trade, unless the latter would pay a bill for which he denied responsibility. The plaintiff's payment of the bill in these circumstances was held to have been made under duress. Accord: *Lonergan* v. *Buford*, 148 U. S. 581, 589–91; *Fenwick Shipping Co.* v. *Clarke Bros.*, 133 Ga. 43, 65 S. E. 140; *Stenton* v. *Jerome*, 54 N. Y. 480; *Harmony* v. *Bingham*, 12 N. Y. 99.

In *Stiefler* v. *McCullough*, 97 Ind. App. 123, 174 N. E. 823, a merchant who had to obtain a loan in order to remain in business agreed to pay the president of a bank an exorbitant sum in consideration for his services in procuring a loan. The court refused to enforce this agreement as unconscionable. Similarly, in *Niedermeyer* v. *Curators of State University*, 61 Mo. App. 654, a student paid tuition fees which he regarded as excessive, and which he did not believe he was required to pay under his contract with the university, only because he feared expulsion for non-payment. This payment was held to have been made

under duress and hence recoverable. Cf. *Baldwin* v. *Sullivan Timber Co.*, 20 N. Y. Supp. 496; *Kelly* v. *Caplice*, 23 Kan. 474.

Strikingly analogous to the case at bar are the decisions that a salvor who takes advantage of the helplessness of the ship in distress to drive an unconscionable bargain will not be aided by the courts in his attempts to enforce the bargain. *Post* v. *Jones*, 19 How. 150, 160; *The Tornado*, 109 U. S. 110, 117; *The Elfrida*, 172 U. S. 186, 193–94. In *Post* v. *Jones, supra*, it was said that the courts "will not tolerate the doctrine that a salvor can take the advantage of his situation, and avail himself of the calamities of others to drive a bargain; nor will they permit the performance of a public duty to be turned into a traffic of profit." These cases are not unlike the familiar example of the drowning man who agrees to pay an exorbitant sum to a rescuer who would otherwise permit him to drown. No court would enforce a contract made under such circumstances.[2]

To deny the existence of duress in a Government contract by ironic reference to the feebleness of the United States as against the overpowering strength of a single private corporation is an indulgence of rhetoric in disregard of fact. The United States with all its might and majesty never makes a contract. To speak of a contract by the United States is to employ an abstraction. We must not allow it to become a blinding abstraction. Contracts are made not by 130 million Americans but by some official on their behalf. Because the national interest is represented

---

[2] The books are full of cases in which courts have refused to lend themselves as collecting agencies of contracts made under circumstances offensive to the conscience. See, for example, in addition to the cases cited in the text, *Johnson* v. *Ford*, 147 Tenn. 63, 245 S. W. 531; *Harris* v. *Cary*, 112 Va. 362, 71 S. E. 551; *Northwestern Mutual Life Ins. Co.* v. *Barker*, 241 Ky. 490, 497, 44 S. W. 2d 292; *Caivano* v. *Brill*, 171 Misc. 298, 11 N. Y. S. 2d 498.

not by the power of the nation but by an individual professing to exercise authority of vast consequence to the nation, action by Government officials is often not binding against the Government in situations where private parties would be bound.[3] The contracts here were not made by an abstraction known as the United States or by the millions of its citizens. For all practical purposes, the arrangement was entered into by two persons, Bowles and Radford. And it was entered into by them against their better judgment because they had only Hobson's choice—which is no choice. They had no choice in view of the circumstances which subordinated them and by which they were governed, namely, that ships were needed, and needed quickly, and Bethlehem was needed to construct them quickly. The legal alternative—that the Government take over Bethlehem—was not an actual alternative, and Bethlehem knew this as well as the representatives of the Government.

The suggestion is made that Bethlehem's profits under these contracts were not exceptional when compared with the profits made under similar contracts, and that the enormous profits claimed by Bethlehem under these contracts cannot be regarded as supporting the inference that Bethlehem took advantage of the Government's distress. But the only contracts before us are those involved in this litigation. There is nothing in this record which enables us to say that although these contracts are unconscionable, all contracts made by the Government during the same period were no less unconscionable. And

---

[3] E. g., the right to recover money paid under mistake of law, *Wisconsin Central R. Co.* v. *United States*, 164 U. S. 190, 212, and the unavailability against the Government of the defenses of laches or neglect of duty, *United States* v. *Kirkpatrick*, 9 Wheat. 720, 735, and estoppel based on unauthorized acts of its agents, *Lee* v. *Munroe*, 7 Cranch 366; *Utah Power & Light Co.* v. *United States*, 243 U. S. 389, 408–09.

332

even if this were so, it would be no argument that this Court should give its sanction to these contracts by making itself the instrument for realizing the unconscionable profits. What little light the record does cast upon contemporary contracts gives no justification for regarding these contracts as typical. The policy of Charles M. Schwab, Director General of the Fleet Corporation, was to make contracts providing for a maximum profit of 10%, out of which all federal taxes would have to be paid. See Letter of Oct. 2, 1918, to Edward N. Hurley, Chairman of the Shipping Board, relating to contracts with the American Shipbuilding Company.

If we are to go outside the record, the evidence is confusing and unreliable. It must be borne in mind that Bethlehem took no risk of loss, that under the contracts it was protected from the risks of rising costs of labor, materials, transportation, etc., that under the contracts it was not required to make any capital expenditures, that the Government agreed to advance all sums that should be necessary for the performance of the contracts. It is idle to compare the profits made by Bethlehem under these contracts with profits made by industrial concerns of various types under different types of contracts. Such figures are statistical quicksand unless we are told also that in each case the contractor was not required to make any capital investment, that he was insured against normal business risks, and that he was guaranteed a profit, regardless of any change in circumstances.

We know that the policy of the Navy Department with respect to so-called straight cost-plus shipbuilding contracts was to allow profits of 10% of actual cost. See Annual Report of the Secretary of the Navy (1917) p. 33; Annual Report (1918) p. 685; Annual Report (1919) pp. 572–76; Annual Report (1920) pp. 147–48. We know that, similarly, the policy of the War Department with respect to cost-plus contracts for the construction of can-

tonments was to allow profits not exceeding 10% of cost. See Annual Report of the Secretary of War (1917) vol. 1, p. 28; Annual Report (1918) vol. 1, p. 1319; Annual Report (1919) pp. 4138–42. See also Crowell, Government War Contracts, p. 85 (in "emergency building contracts" a sliding scale of profits was employed, ranging from cost plus 7% on contracts less than $100,000 to cost plus 2½% on contracts more than $10,000,000). Similarly, contracts for the construction of buildings to house war workers were let on the basis of cost plus 2½% on contracts over $1,000,000, and 3½% on contracts under $1,000,000. See testimony of Otto M. Eidlitz, President of the U. S. Housing Corporation, Hearings before the subcommittee of the Senate Committee on Public Buildings and Grounds pursuant to S. Res. 371, 65th Cong., 3d Sess., p. 35.

These statistics obviously do not tell the whole story of Government contracts in the last war. But they indicate plainly enough that this Court should not accept, as a basis for decision in this case, the premise that Bethlehem's profits were conventional when compared with profits made in comparable transactions.

It is said, further, that even if these contracts are unenforceable when measured by standards of justice and equity enforced by the courts for centuries, nevertheless this Court must enforce the contracts now before us because Congress and the President specifically authorized such a traffic in profits. The suggestion is not consistent with historical fact.

The legislative history of the Emergency Shipping Fund Act furnishes no support for the contention that, in conferring upon the President authority to enter into contracts for the construction of ships, Congress thereby commanded the courts to enforce all contracts that were made, without regard to their provisions and the circumstances under which they were negotiated. On the contrary, the

debates contain many indications that Congress expected that the shipbuilders of the nation would provide their services for a reasonable compensation, and that the power conferred upon the President to take over shipyards would not be exercised. See remarks of Senator Knox, 55 Cong. Rec. 2518; Senator Calder, 55 *id.* 2529; Rep. Fitzgerald, 55 *id.* 3018. Indeed, the Act itself specified that ships should be built "at such reasonable price as shall be determined by the President." 40 Stat. 182, 183.

The National Defense Act, 39 Stat. 166, 213, specifically provided that "The compensation to be paid to any individual, firm, ... for its products or material, or as rental for use of any manufacturing plant while used by the United States, shall be fair and just." There can be no clearer indication that Congress did not authorize or approve any policy of trafficking in profits. The fact that Congress took care to ascertain whether the war agencies were letting contracts under which excessive profits were being made, see Hearings before subcommittee of the House Committee on Appropriations on H. R. 3971, 65th Cong., 1st Sess., especially pp. 15–17, shows very plainly that Congress in no way countenanced exploitation for exorbitant private profit of the necessities of the Government.

Authority given to make contracts does not imply authority to make unconscionable contracts. Suppose that Congress in authorizing the contracts in question had written into its legislation: *"Provided,* that no agency of government shall be authorized to enter into unconscionable contracts." Can it be that because Congress did not expressly provide that "unconscionable contracts" are unauthorized it impliedly sanctioned the making of "unconscionable contracts"? Or suppose the estimated costs in the contracts were so inflated by Bethlehem that its profits were 200% rather than 22%. Would this Court still be bound to enforce these contracts on the ground that

Congress had commanded their enforcement? Surely, Congress did not impliedly repeal historic legal principles and prohibit this Court from exercising its duty to withhold relief when the particular circumstances disclose an unconscionable arrangement in the making of which the Government's contracting officers had no practical choice.

The suggestion that President Wilson authorized a "traffic in profit" is refuted, if explicit proof be needed, by his utterances. For example, addressing a meeting of mine operators and manufacturers on July 12, 1917, he spoke as follows:

"I hear it insisted that more than a just price, more than a price that will sustain our industries, must be paid; that it is necessary to pay very liberal and unusual profits in order to 'stimulate production'; that nothing but pecuniary rewards will do it—rewards paid in money, not in the mere liberation of the world.

"I take it for granted that those who argue thus do not stop to think what that means. Do they mean that you must be paid, must be bribed, to make your contribution, a contribution that costs you neither a drop of blood nor a tear, when the whole world is in travail and men everywhere depend upon and call to you to bring them out of bondage and make the world a fit place to live in again, amidst peace and justice?

"Do they mean that you will exact a price, drive a bargain, with the men who are enduring the agony of this war on the battlefield, in the trenches, amidst the lurking dangers of the sea, or with the bereaved women and the pitiful children, before you will come forward to do your duty and give some part of your life, in easy, peaceful fashion, for the things we are fighting for, the things we have pledged our fortunes, our lives, our sacred honor to vindicate and defend—liberty and justice and fair dealing and the peace of nations? Of course you will not.

336

"It is inconceivable. Your patriotism is of the same self-denying stuff as the patriotism of the men dead or maimed on the fields of France, or else it is no patriotism at all.

"Let us never speak, then, of profits and of patriotism in the same sentence, but face facts and meet them.

"Let us do sound business, but not in the midst of a mist. Many a grievous burden of taxation will be laid on this Nation, in this generation and in the next, to pay for this war. Let us see to it that for every dollar that is taken from the people's pockets it shall be possible to obtain a dollar's worth of the sound stuffs they need." Public Papers of Woodrow Wilson, Vol. 3, pp. 75–6; 55 Cong. Rec. 4995.

Mr. Justice Holmes has said that "Men must turn square corners when they deal with the Government." *Rock Island, A. & L. R. Co.* v. *United States,* 254 U. S. 141, 143. His admonition has particular relevance when this Court is called upon to enforce agreements made with the Government at war for the production of supplies essential to the prosecution of the war. During wartime the bargaining position of Government contracting officers is inherently weak, no matter how conscientious they may be. If they are to deal on equal terms with private contractors, particularly where the subject matter of contracts is so intricate and so specialized as the building of ships, they must have available to them not only detailed information but also the time within which to study the data and the freedom to exercise a real choice. In the last war, at least, this was not generally true. See Sen. Rep. No. 944, 74th Cong., 1st Sess., pt. 4, p. 30. It is not difficult in these days to appreciate the position of negotiators for the Government in time of war and to realize how much the pressures of war deprive them of equality of bargaining power in situations where bargaining with private contractors is the only practicable means of securing necessary war supplies.

Because the Government is in such a dependent position, and because those who deal with it on a cost-plus arrangement, or some similar basis, are assured of a profit, it is wholly consistent with practicalities and makes no unduly idealistic demand for the law to judge the arrangements of such wartime contractors by standards not unlike those by which a fiduciary's conduct is judged. Those upon whom the Nation is dependent for its supplies in the defense of its life would hardly wish to be judged by lower standards.

The modes are vast and varied by which the Nation obtains its war supplies. What will best supply war needs in amplest measure in the quickest time and least wastefully—whether by private letting and, if so, under what restrictions and safeguards; under what circumstances the Government should do its own supplying either by taking over old plants or building new ones or a combination of the two; to what extent and through what means peacetime habits and traditions may be displaced and disregarded—these are questions of policy for the wisdom and responsibility of the Congress and the Executive. The very limited scope of inquiry to which a litigation on a particular transaction is confined is hardly the basis for judgment on such far-flung issues. If the history of this Court permits one generalization above all others, it is the unwisdom of entering the domain of policy outside the very narrow legal limits presented by the record of a particular litigation. Such intrusion into the executive and legislative domains is not conducive to the just disposition of the immediate controversy. We are much less likely to go wrong if we do not depart from the well-grooved path of judicial competence.

This Court should not permit Bethlehem to recover these unconscionable profits, and thereby "make the court the instrument of this injustice." *Thomas* v. *Brownville, Ft. K. & P. R. Co.*, 109 U. S. 522, 526.

Mr. Justice Douglas:

On the point of duress and coercion I thoroughly agree with the views expressed by Mr. Justice Black and join in the opinion of the Court. For the reasons stated by Mr. Justice Black, the claim that Bethlehem's profits were unconscionable in the legal sense would likewise fail.

There is, however, one aspect of the case on which I take a somewhat different view.

The United States does not contest here the right of Bethlehem to retain its "fixed fee" of approximately $12,-000,000 for the construction of the ships. The dispute revolves around an additional sum of $12,000,000 which Bethlehem claims under the so-called "bonus-for-savings" provision of the contracts. That provision in the several contracts was the same except for the amount of the fixed fee. Thus a typical contract provided: "Should the actual cost be less than the estimated . . . cost . . . the Contractor shall be allowed as profit on each vessel in addition to said fixed sum for profit of . . . $210,000 one-half the amount by which such actual cost of each vessel falls short of the estimated cost . . ."

I agree that the consummation of the bargain depended upon the inclusion of this "savings" clause and that in each instance there was but one contract, not several. My view, however, is that each contract was divisible or severable. ". . . the essential feature of such a contract is that a portion of the price is by the terms of the agreement set off against a portion of the performance and made payable for that portion, so that when an apportioned part of the performance has been rendered a debt for that part immediately arises." Williston on Contracts, § 861 (Rev. Ed.). In other words, the whole performance of each contract was divided "into two sets of partial performances, each part of each set being the agreed exchange

for a corresponding part of the set of performances to be rendered by the other promisor." *Id.,* § 860A. (1) The promise of the Fleet Corporation to pay the actual cost plus the fixed fee was exchanged for Bethlehem's undertaking to construct the ships. (2) The promise of the Fleet Corporation to pay one-half the amount by which the actual cost fell short of the estimated cost was exchanged for Bethlehem's promise (which is implied) to effect the savings by increasing efficiency.

Although I am clear that the contracts would not have been made but for the inclusion of the "savings" provision, I do not believe that there is a "necessary dependency" between these two sets of promises within the rule of *Philadelphia, W. & B. R. Co.* v. *Howard,* 13 How. 307, 339. And see *Pollak* v. *Brush Electric Assn.,* 128 U. S. 446, 455; *Fullmer* v. *Poust,* 155 Pa. 275, 278, 26 A. 543; Restatement, Contracts, § 266 (3). Precedents, to be sure, are of little aid since each case turns on its special circumstances. But the construction of divisibility seems warranted by the facts, though here as in other cases considerable reliance must be placed on implications.

Bethlehem's argument against divisibility rests on such testimony of Piez, who represented the Fleet Corporation, as follows: "The price had to be placed for actual cost, if we knew the cost, plus an allowance for contingencies, plus an allowance for incentive, plus the fee. So we start out with the bare cost; then in order to meet any contingencies that may happen, add some allowance for contingencies; in order to give a proper incentive, add an incentive allowance; and then add the fee." That is to say the "savings" clause was deemed to be valuable from the Fleet Corporation's viewpoint as an "incentive" to keep the costs down and to expedite the work. And Powell, the author of the "savings" clause in this case and the representative of Bethlehem, testified that the savings to be obtained would

be sufficient to "wipe out the excess profits taxes," so that the fixed fee would be "net" to Bethlehem.

But Powell's testimony also indicated that while the "savings" clause was an "incentive," Bethlehem was to earn the "savings":

"Q. Then I take it that one of your great problems, as the driving force of this organization, was to improve your labor conditions, or first to prevent labor conditions from getting worse and then to try to improve them?

"A. Yes.

"Q. Over what they were in December of 1917?

"A. Yes.

"Q. And if you were able to do that, then there was a possibility of some profit in these contracts under the half savings clause?

"A. Yes.

"Q. Was there any likelihood, or did you at that time foresee any likelihood, of any substantial saving in your material items?

"A. No, I should not have expected at that time to make any saving of any amount in the materials.

"Q. So that, if Bethlehem was to make any money out of these contracts in excess of the fixed fee, it was your judgment that the only way to do it was by increasing the efficiency of the yards?

"A. Exactly."

Powell also testified:

"The estimate was a figure which we had to shoot at that in my judgment gave us a reasonable profit or a chance of making a substantial saving. To make that saving, we had to operate more efficiently than what we might say was average efficiency under conditions that then existed. If we were going to make that saving, we had to overcome any increased cost due to decreased efficiency, and increase efficiency beyond what it was at that time."

And Piez testified that the provision was to give the shipbuilders an "incentive" to "use their ingenuity to make a larger profit."

The Special Master found that the estimates designated as "base prices" in the contracts "would afford Bethlehem a reasonable opportunity to effect 'savings' as a result of its efforts and ability to increase efficiency of management and labor as compared with average efficiency then existing." He also found that "it was understood that participation in 'savings' was supposed to represent a bonus or additional compensation to be earned by Bethlehem as consideration for its special efforts and ability to reduce cost by increasing efficiency of management and labor as compared with efficiency then existing." Yet he further found that "Bethlehem was to participate in savings however earned, but expected to produce savings by increased efficiency."

My difficulty is with that last finding. If Bethlehem was to share half of the savings "however earned," then its right to receive the bonus might well depend on a wholly fortuitous circumstance or it might accrue as petitioner suggests "simply as a reward for the inaccuracy of its estimate of actual costs." Under that view Bethlehem would be entitled to $12,000,000 additional compensation merely because the wholesale price index fell. Yet that would be tantamount to a gift by public officers of property of the United States. The same result would follow if the clause be read as containing merely a "best efforts" provision. The contract already provided that Bethlehem "in all its acts hereunder, shall use its best efforts to protect and subserve the interest of the Owner." Even in the absence of such a provision, one would be implied. *United States v. A. Bentley & Sons Co.*, 293 F. 229, 235; *United States v. George A. Fuller Co.*, 296 F. 178, 180. Hence it is difficult for me to imply that this additional $12,000,000 was offered as a reward for performing an obligation which the

law would impose on the contractor in any event. *Burke & James, Inc.* v. *United States,* 63 Ct. Cls. 36, 57. That, too, would be a grant of public funds for which the United States would receive no *quid pro quo.*

Hence it seems more reasonable to imply that Bethlehem was to render an additional performance for the additional compensation of $12,000,000. Such a construction of the contracts avoids the difficulties I have mentioned, as it gives the United States a *quid pro quo* for its promise to pay an additional $12,000,000. Cf. *Dayton Airplane Co.* v. *United States,* 21 F. 2d 673, 682–683. And it is supported by the testimony of the representatives of the two contracting parties who negotiated the contracts.

In that view of the matter, Bethlehem would be put to its proof that it effected the savings which it now claims. Mere guesswork would not be enough. *J. J. Preis & Co.* v. *United States,* 58 Ct. Cls. 81, 86. Precise proof of each dollar saved might not be possible. But a reasonable approximation of Bethlehem's contribution to the savings would be necessary. Such burden of proof has been sustained in other cases involving similar contracts. *Cohen, Endel & Co.* v. *United States,* 60 Ct. Cls. 513; *F. Jacobson & Sons* v. *United States,* 61 Ct. Cls. 420. The Circuit Court of Appeals stated that there was "some evidence tending to show that savings resulted, in part at least, from increased efficiency." 113 F. 2d 301, 307. But there was no clear showing that special efforts were made to reduce costs and that the savings which resulted were traceable to such efforts. The necessary findings on that issue were not made.