**SECURITY UNDERGROUND STORAGE, INC., a corporation, and G. H. Billue, Appellants,**

v.

**Henry J. ANDERSON, Jr., and Steve Latham, First-Wichita National Bank of Wichita Falls, Appellees.**

**Henry J. ANDERSON, Jr., and Steve Latham, Appellants,**

v.

**SECURITY UNDERGROUND STORAGE, INC., and G. H. Billue, Appellees.**

Nos. 7814, 7815.

United States Court of Appeals Tenth Circuit.

June 30, 1965.

William P. Thompson, Wichita, Kan., and Evart Mills, McPherson, Kan. (Michael Thomas Mills, McPherson, Kan., and A. W. Hershberger, Richard Jones, H. E. Jones, Jerome E. Jones, Robert J. Roth, William R. Smith and Robert J. O'Connor, Wichita, Kan., on the brief), for Security Underground Storage, Inc., and G. H. Billue.

Wayne Coulson, Wichita, Kan. (Paul R. Kitch, Dale M. Stucky, Donald R. Newkirk, Gerrit H. Wormhoudt, Wichita, Kan., on the brief), for Henry J. Anderson, Jr., and Steve Latham.

Before PHILLIPS, PICKETT and LEWIS, Circuit Judges.

PICKETT, Circuit Judge.

The plaintiffs, Anderson and Latham, attorneys at Wichita Falls, Texas, brought this action to recover an amount alleged due them from the defendants, Billue and Security Underground Storage, Inc., a Kansas corporation, on a contract entered into between the parties. In counterclaims the corporation sought to recover the amount paid under the contract, and Billue alleged that he had suffered damages from the plaintiffs' violation of their duties and obligations to him as attorneys. The trial, to a jury, resulted in a verdict for the plaintiffs for the amount claimed to be due on the contract, but in favor of the defendants on the latter counterclaim. Both parties have appealed from the judgments entered on the verdicts.

Prior to 1955, Billue had developed a method of washing out underground beds of salt to create caverns useful for the storage of petroleum fuel.[1] Anderson and his law firm had represented Billue on different matters, including the formation of a Texas corporation, 80% of the authorized stock being issued to Billue and his wife, and 20% to Anderson. Billue was interested in obtaining a contract with the United States Air Force for the use of this type of underground storage. After unsuccessful attempts to get a contract, he consulted Anderson. Sometime thereafter, Anderson prevailed upon two additional persons to assist in obtaining this contract.[2] The service of these individuals, including that of Anderson, required numerous trips to Washington, D. C., and elsewhere. Eventually the Air Force recognized the feasibility of these caverns for storage, the cost of which was substantially less than that of the conventional storage space. It was decided that the bids for the contract would be in the name of the corporation which had been created some time before. At the time the contract with the Air Force was agreed upon, the original stock-holding in the corporation remained.

For the purpose of making the required storage space available, it was necessary that financial assistance be obtained. Early in 1956, W. G. Ellis of Houston, Texas agreed to advance $365,000 to the corporation for the purpose of purchasing salt lands near McPherson, Kansas, and for the development of storage space thereon.[3] The Ellis notes were

1. The space was created by forcing water into the salt bed. As the water dissolved the salt, the solution was extracted through tubing.

2. The men who undertook this task were J. G. Haralson, Jr., an engineer with contacts in Washington, and E. J. Fourticq, former head of the Armed Service Petroleum Purchasing Agency.

3. Thirty acres of land were purchased in Kansas, the title to which was taken in the names of Billue and Anderson, joint-

signed by the corporation and by Billue and Anderson as individuals. This obligation was later increased to $425,000. The Ellis contract provided that Ellis should receive 17% of the income from the Air Force contract for five years, and 15% thereafter so long as the contract was in existence. The amount advanced by Ellis was repaid in full during the year 1958.

During the negotiations for the government contract, Billue and Anderson agreed that interests in the corporation should be given to Haralson and Fourticq, who were responsible for the final consummation of the contract. Sometime thereafter Anderson's stock percentage was increased to 43% with the understanding that the obligation for the services of these two persons would be taken care of from this 43%. These interests were later acquired by Anderson.

In 1958 and early in 1959, Billue, Anderson and Latham, the latter being a law partner of Anderson, acquired an interest in two producing oil and gas leases in Reeves County, Texas. The percentage of ownership in these leases was the same as that of the stock ownership in the corporation—57% to Billue and 43% to Anderson and Latham. There was testimony that the leases had a value of approximately $300,000. The value placed on the storage project was as high as one million dollars. There was substantial income from this project other than that received from the Air Force contract.[4]

After the amount advanced by Ellis had been paid, the corporation, Billue and Anderson brought an action in Texas against Ellis for the purpose of invalidating the contract with him, alleging that it was usurious under Texas law.

Early in 1959, both Billue and Anderson were dissatisfied, and difficulties arose between them. Billue thought his 57% was inadequate, and Anderson was unhappy over Billue's failure to account for the income of the corporation. In June of that year Anderson went to McPherson, Kansas, for the purpose of dissolving the existing arrangements and to divide the property. A division was suggested by a Wichita Falls attorney, who represented the corporation and Billue in tax matters, as the most practical way to settle the dispute. During the negotiations in McPherson, extreme bitterness developed between Billue and Anderson and at time settlement discussions could be carried on only through representatives of Billue, including a McPherson attorney. A division was finally agreed upon in which Billue was to have the storage project, and Anderson and Latham the Texas oil and gas leases and $295,000.00. It was agreed that $10,000.00 of this amount was to be paid to Anderson in cash for the transfer of his stock in the corporation and the balance payable in equal monthly installments over a period of 48 months.

At Billue's insistence, Anderson agreed that his law firm would continue as attorneys, along with others, in the Ellis suit.[5] A memorandum of agreement was prepared and executed, which required Anderson's law firm to continue, along with others, as attorneys of record in the Ellis litigation.[6] The amount of cash

ly, with the understanding that the ownership should be the same as their stock ownership in the corporation. Approximately twelve acres of the land was leased to the corporation at a rental of $3,000 per month. The storage space on this land was taken by the United States Air Force at a rental of $35,000 per month.

4. In addition to that leased to the government, Billue leased petroleum storage space to the National Co-operative Refining Association, and sold salt brine to Skelly Oil Company. His net income during 1958 and 1959 from these two activities totaled $28,600.00.

5. It was also agreed that if the Ellis lawsuit was lost, $30,000 should be deducted from the balance payable to Anderson.

6. Billue testified that he was fearful if Anderson and his partners did not participate, Anderson would "sell out to Ellis. This would ruin our lawsuit and we wouldn't have a lawsuit any more."

which was fixed in the division of the property to be paid to Anderson and Latham was designated in this contract as "attorney fees." At a later date the contract, together with all of the necessary deeds, stock transfers and assignments, was executed and delivered to effectuate the property settlement. The parties have stipulated that none of the instruments, including the contract for attorney fees, would have been executed if all of them had not been executed and delivered at the same time. The parties also stipulated that the culmination of the negotiations was intended as a general settlement of the affairs of Billue and Anderson's law firm.

The monthly payments were made for some time, but while attempting to settle the pending Ellis law suit,[7] Billue obtained information which convinced him that Anderson had sponsored an action against him by a third party. Whereupon, through his attorney, he notified Anderson that no further payments would be made. The notice stated that the contract was invalid because Anderson had taken advantage of the relationship of attorney and client which existed at the time the contract was signed. An offer was made to make a settlement on a "fair and equitable basis."

In the pleadings and in pre-trial proceedings, the defendants contended that the contract for attorney fees should be considered by itself and not with the other transactions which grew out of the settlement. The payments due thereunder were the only portion of the settlement which had not been fully performed. The parties agreed that the question of whether the contract referring to attorney fees should be considered separately or as an indivisible part of the final settlement between the parties should be tried to the court without a jury. The court found that the contract which provided for the payment of the $285,000 as attorney fees was an indivisible part of the agreement and could not be treated separately. Considering the

record as a whole, no rational conclusion could be reached other than that this amount was agreed upon to make up the difference in the value of the Anderson interest in the Texas leases and the value of his interest in the storage project. Throughout the settlement negotiations the only dispute holding up final settlement was the amount which should be paid to Anderson in addition to the transfer to him of the Texas leases. Originally Anderson demanded approximately $400,000. Copeland, who was acting as a go-between for Billue, testified as follows:

"Q. (By Mr. Coulson) Mr. Copeland, do you recall that when Mr. Anderson started talking to you, that he wanted $400,000.00 at the outset? A. If that was not the figure, it was somewhere in that neighborhood.

Q. And you kept negotiating and reducing down from that figure? A. We talked and the figure grew less, the longer we talked the less the figure became.

Q. And every time you would get it down fairly substantially, why, you would go over and report to Billue? A. Yes, Sir.

Q. And Billue would say, 'Go back and whittle some more on it?' A. Yes, sir, 'too much, not going to pay it.' * * * "

Later Copeland reported to Billue that he had alternative proposals (1) Anderson would agree to take $333,000 and the Reeves County leases, and pay 43% of whatever was to be paid to Ellis including court costs, or (2) $295,000 which would be reduced to $265,000 if the Ellis case was lost. Billue said: "It's a deal," and accepted the second alternative. The only legal services to be performed by the Anderson firm was to assist in the Ellis suit.

█ The agreement to pay the $295,-000 was one of a number of promises made by the parties as a complete settlement for a division of their jointly own-

---

7. Without consulting Anderson, the Ellis matter was settled by paying Ellis $100,000 for his claim under his contract.

ed properties. It was a single part of a single agreement which could not be rescinded alone. United States v. Bethlehem Steel Corp., 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855; Franklin v. American Nat. Ins. Co., 10 Cir., 135 F.2d 531; Alexander v. Phillips Petroleum Co., 10 Cir., 130 F.2d 593.

The contracts being indivisible, Billue and the corporation must affirm or disaffirm it in its entirety. They may not disaffirm as to their contractual obligations and retain the benefits they have received. Wilhelm v. Consolidated Oil Co., 10 Cir., 84 F.2d 739; Paskvan v. Mesich, 9 Cir., 227 F.2d 646, 16 Alaska 1; Lummus Co. v. Commonwealth Oil Ref. Co., 1 Cir., 280 F.2d 915, 91 A.L.R.2d 912, cert. denied 364 U.S. 911, 81 S.Ct. 274, 5 L.Ed.2d 225. If a party to a contract remains silent as to a claimed invalidity of a contract and continues to treat property as his own which was the subject of the contract, he will be deemed to have waived his objection and will be bound by the instrument. Morse v. Kogle, 162 Kan. 558, 178 P.2d 275; Lichter v. Goss, 7 Cir., 232 F.2d 715; Jack Mann Chevrolet Co. v. Associates Inv. Co., 6 Cir., 125 F.2d 778; American Mannex Corp. v. Huffstutler, 5 Cir., 329 F.2d 449.

The evidence is without conflict that the relationship of attorney and client had existed between Billue and Anderson over a period of years, but their association had developed far beyond that. Their joint business activities and property ownership were extensive. The annual income from these activities approached one half million dollars. When difficulties arose between the parties they met to discontinue their business relationship and divide the property which they owned. The court or a jury need not shut its eyes to the fact that the parties were not dealing as at-

torneys and clients, but were driving hard bargains at arm's length as able business men. When this settlement was made there was nothing to indicate that there was a failure of the fidelity which an attorney owes his client or that a client was over-reached or that there was any legal duress or coercion. The presumption of undue influence, as stated in Neary v. Markham, 10 Cir., 155 F.2d 485,[8] has no application, and the jury was so instructed  See, also, Simler v. Conner, 10 Cir., 282 F.2d 382, cert. denied 365 U.S. 844, 81 S.Ct. 803, 5 L.Ed.2d 809; Littleton v. Kincaid, 4 Cir., 179 F.2d 848, 27 A.L.R.2d 572, cert. denied 340 U.S. 809, 71 S.Ct. 38, 95 L.Ed. 595. In any event, the defendants did not see fit to challenge the validity of the entire settlement contract and are not in a position to question only a part of it.

The counterclaim of Billue alleges in substance, (1) that while Anderson was acting as his attorney, he wrongfully conspired and connived to obtain sufficient stock in the corporation to deprive Billue of control thereof in violation of his duties and obligations as an attorney, and (2) that Anderson, while acting as Billue's attorney, wilfully and maliciously assisted W. F. Garmon in bringing an action against Billue to recover some $328,000, in violation of his duties and obligations as an attorney to his client. There was evidence from which a jury could find that Anderson, while acting as attorney for Billue and the corporation, instigated and promoted a law suit against Billue and advanced substantial funds to Garmon to prosecute the same. The jury found for Billue on the second claim and returned a verdict in his favor.[9]

The plaintiffs do not question the sufficiency of the evidence to sustain the judgment, but contend that the court's instructions to the jury did not inform

8. In Neary v. Markham, 10 Cir., 155 F.2d 485, 488, the general rule is stated as follows:

"Contracts between attorneys and clients, while not absolutely void, are carefully scrutinized. While they are not void as a matter of law, they are presumptively fraudulent, and will not be upheld at the instance of the attorney unless a searching scrutiny shows them to be fair, just and equitable." (footnote omitted)

9. The verdict reads as follows: "We, the Jury, find for the defendants against

the jury as to what was necessary to constitute a cause of action in this type of case. The instruction complained of reads:

> "You are instructed that the promotion of unnecessary litigation by way of encouragement, support or financial assistance to a party to a suit by a person having no lawful interest in bringing such suit, and which suit thereafter fails, renders the person furnishing encouragement, support, or financial assistance liable in damages to the person who was sued. Such person who was so sued is entitled to recover all of his expense resulting from such litigation."

It is generally accepted that a cause of action for damages arising out of the common-law doctrine of champerty and maintenance as it was then known, is not now recognized. Golden Commissary Corp. v. Shipley, Munic.Ct. App., D.C., 157 A.2d 810; 14 Am.Jur.2d, Champerty & Maintenance; 14 C.J.S., Champerty and Maintenance. The decisional law of today dealing with the subject usually involves the validity of contracts asserted to be violations of the doctrine. See, for example, Boettcher v. Criscione, 180 Kan. 39, 299 P.2d 806, modified at 180 Kan. 484, 305 P.2d 1055; Vandegrift & Co. v. Lanyon Zinc Co., 87 Kan. 376, 124 P. 534. This does not mean, however, that there is no existing remedy for such conduct under modern law. As an outgrowth of the ancient· rule the existing remedies are through tort actions such as malicious prosecution, abuse of process, and wrongful initiation of litigation. Chapter 30, Restatement of the Law of Torts, Vol. 3 deals with the liability for damages of one who wrongfully initiates civil proceedings. Section 674 states the general rule as follows:

> "One who initiates or procures the initiation of civil proceedings

against another is liable to him for the harm done thereby, if

> (a) the proceedings are initiated
>> (i) without probable cause, and
>> (ii) primarily for a purpose other than that of securing the adjudication of the claim on which the proceedings are based, and
> (b) except where they are ex parte, the proceedings have terminated in favor of the person against whom they are brought."

See also, Prosser, Torts, 2 Ed., Ch. 21, § 99, pp. 664–667. One who wrongfully procures initiation of civil proceedings is liable in the same manner as one who initiates them. In such actions a plaintiff must allege and prove that the defendant initiated or procured the initiation of civil proceedings against him without probable cause and primarily for a purpose other than that of securing an adjudication of the claim upon which the action is based. In jury cases the court must instruct the jury as to the law which defines the liability. The gist of the instruction complained of in this case is that there was liability if a person having no lawful interest in bringing the action, promoted unnecessary litigation by way of encouragement, support or financial assistance to the party bringing the action. The necessity for establishing want of probable cause for the claim sued upon or that the primary purpose of the action was other than that of securing an adjudication of the claim upon which the action was based was not mentioned. If some of the testimony in regard to Anderson's conduct and activities in the Garmon case is true, they were reprehensible and in violation of professional ethics,[10] but insufficient .to sustain a recovery of damages unless the action initiated was terminated in favor

---

the plaintiffs upon the Garmon suit and assess actual damages at $13,767.54 and punitive damages at $ none."

10. American Bar Association Canon of Professional Ethics, No. 28.

of Billue and was brought without probable cause and for some purpose other than an adjudication of the claim upon which the action was based.

The judgment in Case Number 7814 is affirmed. The judgment in Case Number 7815 is reversed and the cause remanded for a new trial on the counterclaim growing out of the Garmon suit.