AMERICAN HOTEL MANAGEMENT ASSOCIATES, INC.; John R. Connelly and James Noulis, Appellees,

v.

Hugh JONES, Individually and as an Officer and Director; Norman D. Groh, Individually and as an Officer and Director and National Hotel Management Corp., Appellants,

v.

Edward HALLORAN, Individually and as an Officer and Director, Third Party Defendant.

AMERICAN HOTEL MANAGEMENT ASSOCIATES, INC.; John R. Connelly and James Noulis, Plaintiffs,

v.

Hugh JONES, Individually and as an Officer and Director; Norman D. Groh, Individually and as an Officer and Director and National Hotel Management Corp., Appellees,

v.

Edward HALLORAN, Individually and as an Officer and Director, Appellant.

Nos. 84–1954(L), 84–1955.

United States Court of Appeals, Fourth Circuit.

Argued March 4, 1985.

Decided July 22, 1985.

**564**

Elizabeth F. Kuniholm, Raleigh, N.C., Robert S. Smith, New York City (John R. Edwards, Tharrington, Smith & Hargrove, Raleigh, N.C., Robert S. Smith and Shira Perlmutter; Paul, Weiss, Rifkind, Wharton & Garrison, New York City, James L. Blackburn, Raleigh, N.C., on brief), for appellants.

Cecil W. Harrison, Jr., Raleigh, N.C. (David W. Long, Poyner, Geraghty, Hartsfield & Townsend, Raleigh, N.C., on brief), for appellees.

Before RUSSELL, PHILLIPS and MURNAGHAN, Circuit Judges.

PER CURIAM:

Here are two consolidated appeals from a judgment entered on a jury verdict in the United States District Court for the Eastern District of North Carolina. Hugh Jones, Norman Groh, and National Hotel Management Corporation (NHM), who were defendants below, appeal from a judgment entered in favor of John Connelly and James Noulis. Edward Halloran, a third party defendant, appeals from a verdict by the same jury in favor of third party plaintiffs, Jones, Groh, and NHM.

I

The action began on November 22, 1982, when American Hotel Management Associates, Inc. (AHMA), Connelly and Noulis ("plaintiffs") filed a complaint to re-establish their interest in NHM stock.[1] Connelly and Noulis alleged that Jones had received NHM stock as their representative and then improperly held it for himself. Jones and Groh brought in Halloran as a third party defendant, claiming that his role in the prosecution of plaintiffs' action was tortious and a breach of his fiduciary duty.

The antecedents to the dispute seemed innocent enough at the time, yet the prospect of serious division, upon closer examination, never was far beyond the immediate horizon. The cast of characters is as follows: Connelly and Noulis are principal shareholders and officers of AHMA, a hotel management company located in Raleigh, North Carolina. In 1976 Connelly, Noulis and Jones joined forces and formed an affiliated company—AHMA of Georgia, Inc. Jones' responsibility was to obtain hotel management contracts for the new company. He was paid a salary and received other benefits, including stock in AHMA of Georgia. While working for AHMA of Georgia, Jones rekindled a business relationship with Groh, a Virginia-based hotel owner. Groh, in turn, introduced Jones to Halloran, a wealthy New York businessman who was in the midst of developing what would become known as the Halloran House Hotel, in New York City. Groh and Halloran were partners in the hotel project.

In early 1977, Groh and Halloran invited Jones to join them in forming a company, NHM, to manage Halloran House. All agreed that Jones, Groh, and Halloran would receive equal ownership interests in NHM. Jones, being an employee of AHMA, naturally consulted with Connelly and Noulis about his joining forces with NHM. Connelly and Noulis viewed the New York project as a potential boon for AHMA. Halloran and Groh planned to develop additional property and thus were a potential source of business for AHMA—so Connelly and Noulis agreed to Jones' participation.

It was undisputed that Connelly, Noulis and Jones orally agreed to Jones' participation in the New York project, paying his salary in return for a share of stock in NHM. For various reasons, Groh and Halloran wanted to deal only with Jones for purposes of corporate ownership. They

---

1. Jurisdiction over the entire action was based on diversity of citizenship. 28 U.S.C. § 1332.

were, however, willing to go along with the agreement reached by the AHMA principals. Consequently, one-third of the NHM stock was issued in the joint names of Jones, Groh, and Halloran. A May 18, 1977 stock purchase agreement confirmed that Jones agreed to share his one-third stock interest in NHM with Connelly and Noulis.[2] Connelly and Noulis, however, never saw any actual stock certificates.

Jones' relationship with Connelly and Noulis deteriorated over the summer of 1977. From AHMA's vantage point, Jones devoted too much time to NHM affairs while offering too little information about the NHM project. Jones ignored repeated requests from Connelly and Noulis for appropriate documentation of their ownership interest in NHM over and beyond the terms of the May 1977 Stock Purchase Agreement. In addition, Connelly wrote several letters to Jones and NHM either complaining about or requesting compensation for the expenses Jones incurred while conducting business for NHM in New York.

By the fall of 1977, the handwriting was on the wall. A series of increasingly caustic letters reflects the emergence of an adversarial relationship between Jones and AHMA. Correspondence from Connelly reveals continued complaints that AHMA was not receiving much in return for contributing Jones' services. One of the first return salvos was launched by Jones as early as November 28, 1977. In response to inquiries from AHMA, he wrote to Connelly, stating that if AHMA wanted reimbursement for the expenses and salary already paid, a change would have to be made in their NHM ownership interest. At trial, Connelly testified that the letter signalled a change in the oral agreement which established the joint ownership interest in NHM.

In February 1978 Connelly and Noulis had had enough. They terminated Jones' interest in AHMA of Georgia and resolved that their company would seek repayment of monies expended on NHM (some $35,-000). Minutes from the meeting where resolutions to that effect were taken reveal that Connelly and Noulis were prepared to sue if reimbursement was not forthcoming. On February 27, 1978 Connelly, expressing his belief that Jones was not living up to his promises, formally demanded a return of the salary and expenses AHMA had paid him, and again complained that he never received confirmation of his ownership interest in the stock in NHM. At this point in time, the remaining ties with Jones frazzled.

A week after the February 1978 letter, Connelly demanded that Jones return the stock he held in AHMA of Georgia. On May 16, 1978 Jones responded to Connelly, writing that, in exchange for returning the AHMA stock, he expected Connelly and Noulis to cancel the May 18, 1977 NHM stock purchase agreement for $10. Enclosed in the letter was a proposed cancellation agreement.[3]

Connelly testified that he was very upset by the letter and had assumed that Jones wanted him and Noulis "out" of NHM. By then, according to Connelly, litigation was

---

**2.** A May 18, 1977 agreement was signed by Groh, Halloran, Jones, Connelly, and Noulis. The agreement recites that Jones was issued one-third of the stock "on behalf of the Jones Group." The exact details of the Jones-Connelly-Noulis agreement were never clearly defined in the pretrial order or at trial, but apparently the oral agreement required Connelly and Noulis to provide Jones' services to NHM as consideration for an ownership interest in the new company.

**3.** The proposed cancellation agreement provided:

**CANCELLATION OF AGREEMENT**

The undersigned, in consideration of Ten ($10.00) Dollars and other valuable consideration, the parties to a certain "Stock Purchase Agreement" dated May 18, 1977 entered into in connection with National Hotel Management, Inc., a Delaware corporation, hereby acknowledge that said Agreement is and shall be deemed cancelled and terminated and ineffective as of the date it was signed, with the same effect as if said Agreement had not been signed, and each party thereto releases the other, including the Corporation, from any and all claim, liability or damage arising out of or pursuant to said Agreement.

inevitable. Connelly wrote to Jones on May 24, 1978 refusing to sign a release. The letter stated, *inter alia:*

> With regard to NHMC, we have no intention of executing any release or returning any agreement until a satisfactory solution has been reached regarding back expenses and equity value you previously agreed to. In your letters of September 13, 1977 and November 28, 1977, as well as legal minutes of corporate meetings, you made commitments to AHMA, INC. as President of NHMC. These commitments were on the basis of a contractural (sic) agreement wherein we provided services and expenses in exchange for ownership in NHMC. We have fulfilled our part of the contract. This contract is reconfirmed in your letters and at Corporate Board meetings. Hugh, you can be guaranteed of our intention to handle this manner on a business like basis and will not allow our agreement with NHMC to be set aside without recourse. The unprofessional manner in which you have handled this entire situation has set the basis for future discussions. We will only communicate through Biff Halloran regarding any settlement with NHMC.
>
> This venture has been extremely costly to our company in that our personnel diverted our revenue and resources to provide income enabling you to develop a company for Biff Halloran and Norman Groh. We, therefore, are entitled to compensation for our expense and ownership in NHMC.[4]

Protracted negotiations then ensued, and a good bit of the trial focused on whether, during 1978 and 1979, the parties reached a settlement agreement. Eventually lawyers were brought into the picture and six successive proposed agreements were exchanged. No final agreement was ever signed. In August 1979 a written settlement was reached but not finalized. Connelly testified that in September 1979 he travelled to New York and received a check for $10,000, and later received a series of promissory notes for $25,000 plus interest. A dispute over interest computations resulted in Connelly and Noulis deciding not to place in escrow a signed release of their claims to NHM stock, and instead authorized their attorney to reject the series of notes and return a check representing the first interest payment. They retained the $10,000.

Thereafter, in December 1979 Connelly and Noulis mailed a sixth and final version of the settlement agreement to Jones' attorney. Defendants never responded to the final proposal.

In February 1980, Connelly's attorney sent a letter to Jones, Groh, and Halloran, which clearly repudiated the settlement and attempted to reassert the rights of Connelly and Noulis to the NHM stock. Over the next two years, however, plaintiffs did nothing to protect their interest, believing the stock had little value.

The final phase of the story begins in June 1982 when Connelly learned that Halloran was embroiled in litigation of his own, in New York, with Groh and Jones over the management of NHM affairs.[5] Around that time Connelly had independently concluded that a three year limitations period was drawing near and contacted an attorney in New York to discuss the possibility of filing an action in the state to pursue his claims against NHM.[6] In Sep-

---

**4.** On the original letter Connelly indicated that a copy was sent to his attorney. At trial Connelly revealed that the notation was a bluff, designed to prompt a solution without recourse to litigation.

**5.** By August 1979 Halloran had become dissatisfied with Jones and Groh, insisted that they had to leave, and in January 1980 locked Jones and Groh out of their office space in New York. In April 1980 Jones and NHM sued Halloran in New York state court, claiming that Halloran wrongfully terminated his agreements with NHM for the management of Halloran House. The New York court upheld the claim of Jones and NHM, finding Halloran had been in breach of contract and had violated a fiduciary duty owed to NHM. The trial court's determination as to liability was upheld on appeal.

**6.** As part of that venture, Connelly contacted Halloran's lawyer, Donald Hooper, in June and October 1982 seeking the addresses of Jones and Groh for possible legal action.

tember 1982 Connelly decided not to file an action in New York, having been advised that his best shot was a breach of contract claim in North Carolina.

Connelly, however, did not pursue a North Carolina action until after he was contacted in October 1982 by the lawyer representing Halloran. On November 1, 1982 Donald Hooper, Halloran's lawyer, Halloran, and Connelly met in North Carolina and discussed Connelly's and Noulis' claims against NHM. At this time, according to Connelly, he first learned that Jones, in the New York litigation against Halloran, had testified to owning two-thirds of the stock of NHM. After some negotiations, including Connelly's demand and receipt of a $5,000 check for giving Halloran the right to look at his NHM file, Halloran and Connelly struck a deal whereby Noulis and Connelly agreed to sell Halloran an option to buy their interest in NHM for $160,000. In addition, Halloran promised to reimburse the legal fees and expenses incurred by plaintiffs in bringing suit to establish their right to two-thirds of the NHM stock held by Jones for the Jones group.[7]

During November 1982 Lacy Presnell, the attorney for Connelly, Noulis and AHMA, prepared a complaint. Halloran's lawyer was consulted on several occasions, reviewed drafts of the complaint, and made several suggestions. Just prior to filing the complaint, Connelly tendered a check for $10,000 to Groh (as secretary to NHM), which was to represent a return of the money paid to AHMA in 1979 as part of the alleged settlement. (The $10,000 came from Halloran.)

When Halloran's role in the action was uncovered in discovery, Groh and Jones filed a third-party complaint against Hallo-

ran alleging 1) the tort of champerty and maintenance and, 2) as a minority shareholder and director of NHM, the breach of fiduciary duty. Both claims arose out of Halloran's alleged instigation of the Connelly-Noulis suit.

As the trial progressed, the defendant's theory was that Connelly and Noulis had settled any rights arising out of the May 1977 stock purchase agreement. Of the five claims asserted by Connelly and Noulis,[8] only two made it to the jury: (1) a claim to a two-thirds interest in the Jones Group stock and (2) a claim to a one-third interest in Groh's stock, which had been held by Jones.[9] On special interrogatories, the jury found that no settlement had been reached among Jones, Connelly, and Noulis in the fall of 1979, and that Connelly and Noulis were entitled to two-ninths of the stock of NHM. The jury also found that plaintiffs' claims were not barred by laches.

On the third party complaint, the jury found that Halloran, by helping plaintiffs file the action, had committed the tort of champerty and maintenance and had breached a fiduciary duty to Jones. The jury awarded Jones and Groh $100,000 on the champerty claim, $50,000 on the fiduciary duty claim and $2,000,000 in punitive damages. All post-verdict motions were denied.[10]

## II

The principal issue raised by Jones is whether Connelly and Noulis filed their complaint within the statute of limitations. Jones contends that the judgment against him should be reversed because the plaintiffs' action, which he asserts is governed by the three year North Carolina statute of

---

7. It was undisputed that Halloran's motive was to acquire a majority interest in NHM so as to mitigate the effect of the possible judgment NHM was seeking against him in New York. Halloran's $160,000 investment proved wise; NHM ultimately was awarded $10.3 million in New York.

8. AHMA was voluntarily dismissed as a plaintiff.

9. For some reason Groh had turned his NHM stock over to Jones to make Jones "feel more comfortable."

10. Connelly and Noulis successfully moved to amend the judgment and obtained a decree ordering partition of the Jones Group stock.

limitations for actions on a contract, *see* N.C.Gen.Stat. § 1–52(1),[11] accrued in May 1978, making the November 22, 1982 complaint untimely. Connelly and Noulis argue that their claim against the Jones Group stock was predicated on a "resulting trust" theory, not contract, and therefore was governed by North Carolina's general ten year period of limitation. *See* N.C.Gen. Stat. § 1–56. Alternatively, they contend that their cause of action arose some time after November 1979.

■ Plaintiffs' attempt to invoke the ten year limitation period, by characterizing their action as a resulting trust, is without merit. In North Carolina a resulting trust is a product of the application of equitable principles, invoked when a person uses the money of another to acquire legal title in property:

> Under such circumstances equity creates a trust in favor of such other person commensurate with his interest in the subject matter. A trust of this sort does not arise from or depend on any agreement between the parties. It results from the fact that one man's money has been invested in land and the conveyance taken in the name of another. It is a mere creature of equity.

*Teachey v. Gurley*, 214 N.C. 288, 199 S.E. 83, 86–87 (1938). A resulting trust "involves a presumption ... of an intention to create a trust based on acts or conduct, rather than on direct expression of conduct." *Bowen v. Darden*, 241 N.C. 11, 84 S.E.2d 289, 292 (1954).

Although Connelly and Noulis have now pointed to facts superficially consistent with a resulting trust, the theory was not pursued at trial. Instead, plaintiffs contended, and Jones readily conceded, that the claim to the stock was based on an oral promise with Jones, *i.e.*, an express contract by which Jones—as part of an overall employment agreement—held the stock for

Connelly and Noulis. At trial all of the parties referred to the arrangement as "contractual." The same characterization is made in plaintiffs' appellate brief. In light of the uncontroverted, direct expressions of a contractual or express trust relationship, plaintiffs cannot, after the fact, successfully fall back on an implied or resulting trust theory simply to take advantage of a longer statute of limitations.

■ We therefore agree with Jones that, under North Carolina law, the applicable statute of limitation is determined by the nature of the substantive right asserted by plaintiffs. Here, as noted above, plaintiffs' substantive right is one of contract. *See Teachey v. Gurley*, 214 N.C. 288, 199 S.E. 83 (1938) (three year statute of limitations applicable to actions alleging a breach of duty under an express trust). At oral argument, plaintiffs conceded that their trust agreement was based on an oral contract. Consequently, we hold that plaintiffs' claim to Jones' NHM stock is governed by the three year limitations period.

Having concluded that the three year statute of limitations applies, we must next decide whether plaintiffs' claim to an ownership interest in Jones' NHM stock was time-barred.

■ Jones promptly raised limitations in his answer. Under settled principles of North Carolina law, Connelly and Noulis had the burden of proving their cause of action accrued after November 22, 1979. *See Jewell v. Price*, 264 N.C. 459, 142 S.E.2d 1 (1965). Despite Jones' responsive pleading, as well as his reassertion of limitations in the pretrial order, plaintiffs never focused the necessary factual issues for a determination by the jury.[12] Nonetheless, limitations can be resolved as a matter of law if undisputed facts establish the time when the cause of action accrued.

---

**11.** Both sides agree that Connelly's and Noulis' action against Jones was governed by North Carolina law for purposes of determining the statute of limitations.

**12.** The jury's verdict in favor of plaintiffs has no bearing on the issue raised on appeal by Jones. None of the issues submitted required the jury to address, either expressly or by implication, the question of limitations.

*See, e.g., Fulp v. Fulp,* 264 N.C. 20, 140 S.E.2d 708, 714 (1965).

Connelly and Noulis argue that, as a matter of law, their cause of action against Jones accrued at the earliest in December 1979—the month settlement negotiations finally broke off. More realistically, they say, the statute of limitations did not begin to run until November 1982—the month they first learned from Halloran that Jones, during the New York litigation, had testified to owning two-thirds of the stock of NHM. Both of plaintiffs' proposed accrual dates borrow principles from the law of trusts. The argument is that, although Jones' employment contract was severed in May 1978, the "Jones Group"—the "trust aspect" of his relationship—was not clearly and unequivocally repudiated until some time after the fall of 1979. *See Teachey v. Gurley, supra* (limitation period on an action for breach of express trust begins to run when trustee disavows trust with knowledge of beneficiary).

The evidence adduced at trial satisfies us that, as a matter of law, plaintiffs' claim to the NHM stock accrued well before settlement negotiations finally ceased in the fall of 1979. The breach, although couched by plaintiffs in terms of trust, also was part of a wider dispute over Jones' employment with AHMA. Prior to November 1979, overwhelming evidence reveals that as the employment relationship deteriorated an adversarial relationship developed between the parties. Shortly after Connelly and Noulis gave their blessing to the NHM venture, they became upset over the fact that Jones was failing to live up to his obligations, both as a fiduciary for the Jones Group and as an employee/officer of AHMA. At trial, Connelly testified that throughout 1977 and early 1978 Jones never responded to repeated requests for documentation of the stock Jones supposedly was holding "in trust" for the benefit of the group. In addition, documents from 1977 through 1978 reveal that plaintiffs were not satisfied with Jones' reports about the NHM project; information they felt was necessary to justify their continued participation in the venture.

The adversarial flavor to the whole affair was in full bloom by the spring of 1978. In February 1978, Jones was kicked out of AHMA of Georgia. In March, plaintiffs made several demands for the return of all AHMA stock certificates. Jones, not wishing to be out-maneuvered, offered, in a May 16, 1978 letter, a deal whereby the AHMA certificates would be returned in exchange for plaintiffs' signature on a document purporting to release all claims to the NHM stock. The May 16th letter, according to plaintiffs' own evidence, represented the end of the consensual arrangement. Connelly's May 24, 1978 letter recited a firm intent not to release any claims until a solution regarding back expenses *and* equity value were resolved. The letter "guaranteed" Connelly's intention to handle the manner in a businesslike basis, declared that the agreement with NHM would not be set aside "without recourse," criticized Jones for handling the entire situation in an "unprofessional manner," and concluded by noting "we are entitled to compensation for our expense and ownership" in NHM. Indeed, plaintiffs were so aroused by the matter that Connelly falsely noted on the letter that a carbon copy had been sent to an attorney. As Connelly candidly testified at trial, the false notation was included because he knew—some four and a half years before the action was filed—that something serious had to be done to protect their interest in NHM.

Plaintiffs' evidence thus amply contradicts their rather self-serving argument on appeal that they had no reason to suspect that their claim of ownership in NHM was disputed by Jones until after December 1979. Plaintiffs' own trial presentation demonstrated that, by May 1978, and thereafter, the concept of "trust" and "fiduciary" no longer described Jones' relationship with plaintiffs. Controversy and contention were rampant.

Connelly and Noulis make much of the fact that protracted settlement negotiations followed the May 1978 fall out. Such negotiations, they assert, tend to corrob-

orate the view that Jones continued to recognize the Jones Group. We disagree. Even if during the negotiations Jones made no explicit "I own it all" statement, plaintiffs were painfully aware that Jones no longer represented their interests in NHM. That is what the dispute was all about.[13] The controversy was not limited to the narrow trust issue neatly set out on appeal. Rather, the issue of stock ownership was part of the wider dispute over Jones' role in the various corporations. The parties set out to negotiate a settlement of "differences," differences which included plaintiffs' equity interest in NHM. There is no basis in the record to support plaintiffs' characterization that, despite the wider dispute, Jones was still acting as trustee.

We recognize that plaintiffs' limitations argument touches some factual questions. Had plaintiffs focused the issue at trial, some favorable testimony might well have been adduced sufficient to persuade a jury that the breach occurred after the fall of 1979.[14] However, as the record developed, plaintiffs' evidence unequivocally reveals that an adversary relationship broke out in the spring of 1978 and that plaintiffs thereafter were contemplating litigation. Plaintiffs even took steps to avoid having to file a lawsuit.

■ Consequently, we hold that Jones repudiated the trust relationship by May 1978 and that plaintiffs' cause of action, filed in November 1982, was barred by the three year statute of limitations.

## III

Halloran, the third party defendant, challenges (1) the $100,000 judgment for damages caused by the tort of champerty and maintenance, (2) the $50,000 judgment for a breach of fiduciary duty, and (3) the $2,000,000 punitive damage award.

### A.

Jones and Groh alleged that Halloran was the moving force behind Connelly's and Noulis' decision to file the present action. His role in encouraging the suit, they contend, constituted champerty and maintenance under North Carolina law. *See Smith v. Hartsell*, 150 N.C. 71, 63 S.E. 172 (1906).

Halloran, rather persuasively, has documented that most jurisdictions no longer recognize causes of action for damages based on champerty and maintenance. *See, e.g., Alexander v. Unification Church of America*, 634 F.2d 673, 677 & n. 6 (2d Cir.1980); *Security Underground Storage, Inc. v. Anderson*, 347 F.2d 964, 969 (10th Cir.1965). Existing remedies for damages, Halloran notes, are pursued through such tort actions as malicious prosecution, abuse of process, or wrongful initiation of litigation; the champerty and maintenance doctrine remains viable only as a defense in contract actions. Halloran, however, has referred us to no North Carolina decision where champerty and maintenance formally has been repudiated, but he asks that we declare the tort dead in the jurisdiction. We need not, however, decide whether the North Carolina Supreme Court would fall into line, for we are thoroughly convinced that the tort, even assuming it still exists, does not apply to the present dispute.

■ The term "maintenance" has been defined by the North Carolina Supreme Court as "an officious intermeddling in a suit, which in no way belongs to one, by maintaining or assisting either party with money or otherwise to prosecute or defend it." *Smith v. Hartsell*, 150 N.C. 71, 76, 63 S.E. 172, 174 (1908). "Champerty," a form of maintenance, occurs when a stranger makes "a bargain with a plaintiff or defendant to divide the land or other matter sued for between them if they pre-

---

**13.** The February 1980 letter from plaintiffs' attorney to Jones, which recites that his clients intend to maintain an interest in NHM, does not create a factual issue over when the dispute arose. The letter simply reveals the plaintiffs' intention to fight.

**14.** The jury's factual finding that no settlement was reached had no bearing on the question of whether a breach of trust had occurred at some prior point in time.

vail at law, whereupon the champertor is to carry on the party's suit at his own expense." *Id.* Champerty and maintenance will not be found "unless the interference is clearly officious and for the purpose of stirring up 'strife and continuing litigation.'" *Id. See also Wright v. Commercial Union Insurance Co.,* 63 N.C.App. 465, 305 S.E.2d 190 (1983), *pet. for disc. review denied,* 309 N.C. 634, 308 S.E.2d 719 (1983).

▪ Halloran's role in the litigation was hardly champertous. As Jones and Groh concede in their brief, Halloran entered the fray to mitigate the effect of a potential judgment from the New York action filed by Jones, Groh, and NHM. He thus had a justification, a verifiable interest, in helping to vindicate the rights of Connelly and Noulis and in entering a contract which gave him the option of purchasing their stock in NHM. Halloran's pre-existing interest in acquiring more NHM stock sufficiently distinguishes his conduct from the "officious intermeddler" who walks in off the street simply to stir up strife and litigation. He was no stranger to the parties or the dispute. We are satisfied that there was no champerty and maintenance.

### B.

▪ The next issue is whether Halloran's participation in the lawsuit constituted a breach of a fiduciary duty to Jones.[15] In light of our conclusion that Halloran was not involved in champertous speculation or illegal maintenance, we have difficulty in seeing how there is any breach of duty in his assisting Connelly and Noulis vindicate their right to recover stock wrongfully held by Jones, in a corporation which has been virtually defunct since 1980. Indeed, beyond generalities, Jones' brief is bereft of concrete analysis of what Halloran's duty was and how it was breached. Jones' sole argument appears to be that Halloran's role in filing suit in November 1982 "hardly comports with the 'high degree of good faith and mutual respect' that the law requires of principals in a close corporation." He has, however, cited no authority for the rather novel proposition that a director and minority shareholder of a closely held corporation violates a fiduciary duty when he assists a second shareholder to recover stock claimed to be wrongfully withheld by a third shareholder.

Our review of the authorities[16] has uncovered not one case which indicates that a breach of duty should be found in the present factual matrix. Obviously the special nature of a closely held corporation does not, on its own, bar a director from helping a shareholder vindicate a *bona fide* claim against another shareholder. Although Jones has argued that Hooper—the attorney who participated in the aborted settlement negotiations—had a conflict of interest in the lawsuit, we have found no evidence in the record that Halloran abused corporate power through his position as director of NHM. Moreover, in assisting Jones and Connelly, Halloran acted as an individual not a director. We thus hold that Jones failed to prove that Halloran was in breach of a fiduciary duty to Jones and will set aside the compensatory and punitive damage awards.

Accordingly, the judgments awarding stock of NHM to Connelly and Noulis and monetary awards to Jones and Groh are reversed and the case remanded for entry of judgments in accordance with this opinion.

**REVERSED AND REMANDED.**

---

**15.** There is no argument, on behalf of NHM, that the stock option agreement among Halloran, Connelly, and Noulis somehow injured the corporation or was a lost corporate opportunity. We thus confine our analysis to Jones' fiduciary duty claim.

**16.** Jones argued at length that the law of North Carolina (the locus of the tort), not Delaware (the place of incorporation), governs the present action. Jones has not, however, shown a *conflict* between the law of these two jurisdictions. Thus, in any event, the choice of law issue is not dispositive.